2005 VT 133

## Samuel Hamill v. Pawtucket Mutual Insurance Co., David Andrulat, Smith & Carson, Inc. and Richard Dineley

[892 A.2d 226]

No. 05-025

Present: **Reiber, C.J., Dooley, Johnson and Skoglund, JJ., and Allen, C.J. (Ret.), Specially Assigned**

Opinion Filed December 30, 2005

---

*Howard B. Myers* of *Myers Associates, PLLC*, and *David Cullenberg* of *Cullenberg & Tensen, PLLC*, Lebanon, New Hampshire, for Plaintiff-Appellant.

*Allan R. Keyes* of *Ryan, Smith & Carbine, Ltd.*, Rutland, for Defendants-Appellees Andrulat, Smith & Carson, Inc. and Dineley.

¶ 1. **Allen, C.J. (Ret.), Specially Assigned.** In this appeal, we consider whether an insured homeowner whose residence allegedly became uninhabitable due to water damage, and later mold growth, has a cause of action in negligence against the independent adjusters hired by the homeowner's insurer to investigate the insured's initial claim. We affirm the superior court's summary judgment ruling that the adjuster has no cognizable legal duty vis-a-vis the homeowner with respect to the type of damages claimed here, and that the homeowner's only remedy was against his insurer.

¶ 2. The parties stipulated to the following facts. Sometime between February 10 and 12, 2001, while plaintiff Samuel Hamill was away on a business trip, a power outage occurred at his home, causing his pipes to freeze and then burst, resulting in flooding within the house. Hamill discovered the damage when he returned to his home on February 13, 2001. That same day he reported the loss to his insurance agent, who, in turn, notified his insurer, defendant Pawtucket Mutual Insurance Company. Pawtucket contracted out the initial adjusting of the claim to the Vermont office of defendant Smith & Carson, Inc. (known at that time as CSB Group, Inc.). The supervisor of that office, defendant Richard Dineley, assigned the claim to defendant adjuster David Andrulat. Andrulat visited Hamill's home on two occasions in early March 2001 to assess the damage, but Hamill and Pawtucket could not come to an agreement on the value of the loss. Pawtucket allegedly denied Hamill's claims in November 2001 following further brief inspections of the home during the previous month. Hamill asserts that the adjusters negligently investigated his claim, thereby depriving him of insurance proceeds and causing him to incur expenses that he would not otherwise have incurred.

¶ 3. In his second amended complaint, filed in April 2002, Hamill included counts of breach of contract, negligence, bad faith, and punitive damages against Pawtucket, and counts of gross negligence and punitive damages against Andrulat. Hamill alleged that he presented Andrulat with estimates of between $150,000 and $200,000 — excluding plumbing, heating, electrical, roofing, and masonry costs — to repair the water damage, but that, based on a brief visual inspection of the premises, Andrulat rejected the estimates, accused Hamill of insurance fraud, and offered to settle the matter then and there for $5000. Hamill also alleged that after he rejected the adjuster's settlement offer, Andrulat did not get back to him for weeks, even though Andrulat knew or should have known that the water-damaged premises needed to be repaired immediately to prevent the

possibility of mold growth. According to the complaint, as the result of Andrulat's failure to carefully investigate Hamill's claims, to consider his repair estimates, and to make an immediate and thorough inspection of the subject premises, mold spread through the house, making it uninhabitable. The complaint alleged that if Andrulat had acted reasonably in inspecting the premises and assessing the damages, the interior of Hamill's house would have been gutted and rebuilt before the mold had begun to grow.

¶ 4. In February 2004, Hamill filed a complaint against Dineley and Smith & Carson, alleging that they acted negligently and in bad faith by failing to supervise the investigation and processing of his insurance claim. He sought both compensatory and punitive damages. Shortly thereafter, Hamill settled his claims against Pawtucket. On December 9, 2004, after the complaints were consolidated, the superior court entered summary judgment in favor of defendants. The court ruled that Hamill had not alleged a cognizable duty on the part of the adjusters with respect to his negligence action, and that if the adjusters acted in bad faith, resulting in additional damage to Hamill's home, his remedy was to include such claims in his breach-of-contract action against Pawtucket. The court concluded that Hamill was claiming economic losses rather than direct physical loss to his property, and that such losses were not compensable in a tort action under the economic-loss doctrine, which generally disallows claims of economic loss to third parties absent privity of contract.

¶ 5. On appeal, Hamill argues that an independent insurance adjuster should be subject to liability for physical damage to an insured's property resulting from the adjuster's negligent conduct. In his view, no sound public policy considerations justify denying his common-law negligence action against defendant adjusters. Relying primarily on *Morvay v. Hanover Insurance Cos.*, 506 A.2d 333, 335 (N.H. 1986), in which the New Hampshire Supreme Court permitted insured property owners to file a negligence action alleging that agents hired by an insurance company to investigate a claimed fire loss breached their duty to conduct a fair and reasonable investigation of the claim, Hamill argues that defendant adjusters owed him a cognizable legal duty that supports his tort action against them because he was a foreseeably affected third party. According to Hamill, the adjusters knew or should have known that their failure to act properly and promptly in investigating his claim would result in further damage to his property.

¶ 6. We do not find these arguments persuasive. Generally, whether there is a cognizable legal duty that supports a tort action

depends on a variety of public policy considerations and relevant factors, only one of which is foreseeability. *Langle v. Kurkul*, 146 Vt. 513, 519-20, 510 A.2d 1301, 1305 (1986) (citing relevant factors); see *Charleston Dry Cleaners & Laundry, Inc. v. Zurich Amer. Ins. Co.*, 586 S.E.2d 586, 588 (S.C. 2003) ("Foreseeability of injury, in and of itself, does *not* give rise to a duty."). Ultimately, whether a duty exists is a question of fairness that depends on, among other factors, the relationship of the parties, the nature of the risk, and the public interest at stake. *Langle*, 146 Vt. at 520, 510 A.2d at 1305.

▪ ¶ 7. Further, because negligence law does not generally recognize a duty to exercise reasonable care to avoid economic loss unless the alleged tortfeasor's conduct has inflicted some accompanying physical harm, we have recognized that another significant factor in determining whether there is a cognizable duty that would support a tort action is whether the plaintiff seeks damages for only economic loss. *O'Connell v. Killington, Ltd.*, 164 Vt. 73, 77, 665 A.2d 39, 42 (1995); see *Wentworth v. Crawford & Co.*, 174 Vt. 118, 126, 807 A.2d 351, 356 (2002) ("It is well established in Vermont that absent some accompanying physical harm, there is no duty to exercise reasonable care to protect another's economic interests."); *Sanchez v. Lindsey Morden Claims Servs., Inc.*, 84 Cal. Rptr. 2d 799, 801 (Ct. App. 1999) (noting "the unreliability of foreseeability, in isolation, as a grounds for imposing a duty, especially where the injury is 'intangible' rather than physical"). Indeed, the economic-loss rule serves to maintain the boundary between contract law, which is designed to enforce parties' contractual expectations, and tort law, which is designed to protect citizens and their property by imposing a general duty of reasonable care. *Springfield Hydroelectric Co. v. Copp*, 172 Vt. 311, 315, 779 A.2d 67, 71 (2001); *Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1*, 881 P.2d 986, 989-90 (Wash. 1994). In short, liability for purely economic loss generally requires privity between the parties.

¶ 8. Here, notwithstanding his argument that the superior court should not have applied the economic-loss rule because defendants' negligence proximately caused additional physical damage to his property, we conclude that Hamill is seeking damages for only economic loss. According to the parties' stipulated facts, Hamill contends that because of the manner in which defendants adjusted his claim he was deprived of the benefit of insurance, thereby making his house uninhabitable and causing him to incur additional expenses. In other words, Hamill is claiming that defendants' negligent inspection and adjustment resulted in his insurer failing to promptly provide the

proceeds he expected under his insurance policy, which, in turn, allegedly resulted in physical damage to the property that was the subject of the insurance policy, thereby causing him to incur additional repair or replacement costs.

¶ 9. Thus, Hamill is seeking recovery for losses stemming from the failure of his expectations regarding insurance coverage. We agree with the trial court that such damages are most accurately categorized as purely economic losses generally recoverable under contract law, but not tort law. Cf. *Paquette v. Deere & Co.*, 168 Vt. 258, 263, 719 A.2d 410, 413-14 (1998) (in seeking damages for the reduced value of their motor home resulting from its defective wiring system and related problems, plaintiffs sought to recover economic losses for not having received benefit of bargain to which they believed they were entitled); *Redman v. John D. Brush & Co.*, 111 F.3d 1174, 1182-83 (4th Cir. 1997) (theft of coin collection from defective safe was economic loss caused by failure of safe to serve its intended function, not loss of other physical property recoverable in tort suit).[1]

¶ 10. Hamill argues, however, that the superior court failed to give him the benefit of all favorable inferences as to whether material facts were in dispute — namely, whether the alleged negligence led to physical damage as opposed to economic loss. See *Pierce v. Riggs*, 149 Vt. 136, 139, 540 A.2d 655, 657 (1987) (because moving party has burden of establishing that no material facts are in dispute, facts asserted by opposing party that are supported by affidavits or other evidentiary material are regarded as true, and party opposing summary judgment is given benefit of reasonable doubts and inferences as to whether material facts are in dispute). The basis for this contention is the court's comment that Hamill had not spelled out a specific chain of causation to explain how the adjusters' negligence caused additional physical damage. According to Hamill, he plainly alleged that defendants' failure to promptly and properly adjust his claim was a direct and proximate cause of physical damage — the growth of mold in the house — but the court failed to give him the benefit of the doubt as to

---

[1] Apparently, there is a split among jurisdictions as to whether the economic-loss doctrine even applies to contracts for services. See *Ins. Co. of N. Amer. v. Cease Elec. Inc.*, 2004 WI 139 ¶¶ 25, 52, 688 N.W.2d 462, 467, 472 (noting jurisdictional split and holding economic-loss doctrine inapplicable to claims for negligent provision of services). This issue has not been raised either at trial or on appeal, and we decline to address it here. Cf. *Springfield Hydroelectric Co.*, 172 Vt. at 316, 779 A.2d at 72 (declining to address merit and extent of professional-services exception to economic-loss rule).

whether defendants' alleged negligence caused physical damage to his property.

¶ 11. We find no merit to this argument. In its decision, the superior court expressly stated its understanding of Hamill's claim as follows: (1) the adjusters negligently performed their investigation; (2) their negligence caused a delay in Pawtucket's payment of the claim; and (3) the delay in payment caused a delay in repairing the water damage, which, in turn, led to the growth of unhealthy mold, making the home uninhabitable. The court did not fail to give Hamill the benefit of the doubt concerning any disputed material facts. Indeed, the court presumed that Hamill's home became uninhabitable because of mold growth that occurred as the result of the water damage and delays in addressing that damage. Rather, the court ruled as a matter of law that the alleged losses were economic losses, not direct physical losses caused by the adjusters' negligence, because they stemmed from Pawtucket's delay in the payment of insurance proceeds.

¶ 12. The trial court's refusal to find a cognizable legal duty under the circumstances is consistent with the holding of the majority of courts that independent adjusters engaged by insurers are not liable to insureds for economic losses stemming from allegedly negligent claims investigations. See, e.g., *Meineke v. GAB Bus. Servs., Inc.*, 991 P.2d 267, 270-71, ¶¶ 15-19 (Ariz. Ct. App. 1999); *Sanchez*, 84 Cal. Rptr. 2d at 800; *King v. Nat'l Security Fire & Cas. Co.*, 656 So. 2d 1338, 1339 (Fla. Dist. Ct. App. 1995); *Charleston Dry Cleaners*, 586 S.E.2d at 588-89. But see *Morvay*, 506 A.2d at 335 (finding duty); *Brown v. State Farm Fire & Cas. Co.*, 2002 OK Civ. App. 107, ¶ 19, 58 P.3d 217, 223 (accord).

¶ 13. Generally, the reasoning behind the majority view is as follows. The relationship between the insured and the insurer is defined and governed by the insurance policy and its accompanying implied covenant of good faith and fair dealing. *Meineke*, 991 P.2d at 271, ¶ 17. Further, the obligations of an independent adjuster are measured by the contract between the adjuster and the insurer. *Id.* ¶ 16. Because the conduct of an adjuster acting within the scope of his or her authority as agent for the insurer is imputed to the insurer, the insurer is subject to liability for the adjuster's mishandling of claims in actions alleging breach of contract or bad faith. See *id.* ¶¶ 17-18; *Hudock v. Donegal Mut. Ins. Co.*, 264 A.2d 668, 672 (Pa. 1970); *Charleston Dry Cleaners*, 586 S.E.2d at 589. Hence, allowing the insured to sue the independent adjuster in tort for economic losses

allegedly caused by mishandled claims is both unnecessary and contrary to the law of agency. See *Sanchez*, 84 Cal. Rptr. 2d at 803 (agents are generally not liable to third parties for economic losses).

¶ 14. We concur with the majority view that public policy considerations do not favor creating a separate duty on the part of independent adjusters that would subject them to common-law tort actions by insureds who have suffered economic loss as the result of allegedly mishandled claims. As noted, insureds may seek redress for such injuries through breach-of-contract and bad-faith actions against their insurers. See *Bushey v. Allstate Ins. Co.*, 164 Vt. 399, 402, 670 A.2d 807, 809 (1995) (recognizing cause of action for bad-faith failure to pay insurance claim); *Myers v. Ambassador Ins. Co.*, 146 Vt. 552, 556, 508 A.2d 689, 691 (1986) (recognizing that insurer is responsible for acts of its agents). Therefore, in most cases, imposing tort liability on independent adjusters would create a redundancy unjustified by the inevitable costs that eventually would be passed on to insureds. See *Sanchez*, 84 Cal. Rptr. 2d at 802-03.[2]

¶ 15. Further, the insurer contractually controls the responsibilities of its adjuster and retains the ultimate power to deny coverage or pay a claim. *Id.* at 801-02. Subjecting adjusters to potential tort liability from insureds could create conflicting loyalties with respect to the adjusters' contractual obligations, given that insureds and insurers often disagree on the extent of coverage or the amount of damages. *Id.* at 802; *Meineke*, 991 P.2d at 271, ¶ 16.

¶ 16. Moreover, to some extent, insurers can define and limit their risks, and set their premiums commensurate with those risks through conditions, limits, and exclusions in their insurance policies. *Sanchez*, 84 Cal. Rptr. 2d at 802. In contrast, absent any contract with insureds, adjusters cannot circumscribe their potential risks and thus could face potentially open-ended liability. *Id.* This is particularly troublesome because of the unlikelihood that an action claiming negligent mishandling of a claim would be available against even the insurer. See *Myers*,

---

[2] Hamill made bad-faith and breach-of-contract claims against his insurer, but settled those claims. The terms of the settlement were not disclosed, but Hamill suggests that he was not fully compensated for his claimed losses because Pawtucket went into rehabilitation during the pendency of these proceedings. We note, however, that Hamill has not produced any evidence that his settlement with Pawtucket was inadequate. Further, Vermont law provides some protection against insurer insolvency. See 8 V.S.A. §§ 3611-3626. In any event, the possibility of insurance carrier insolvency in rare instances is not sufficient to override the policy grounds for not allowing insureds to challenge allegedly deficient settlements through tort actions against independent adjusters.

146 Vt. at 555 n.1, 508 A.2d at 691 n.1 (declining to consider whether insurer's conduct in bad-faith action is reviewed against negligence standard); see also *Meineke*, 991 P.2d at 271, ¶¶ 17-18 (refusing to allow negligence action against adjuster for mishandling of claim, considering that insured would be limited to either breach-of-contract or bad-faith action against insurer).

¶ 17. Finally, we find unavailing Hamill's argument that Vermont statutory law imposes a duty of care upon independent insurance adjusters, and that any breach of that duty allows insureds to bring negligence claims against the offending adjusters. In making this argument, Hamill relies upon the fact that insurance adjusters are licensed, see 8 V.S.A. § 4793(a), that their licenses must be renewed every two years, see 8 V.S.A. § 4798(a), and that adjusters are listed as one of the types of "person" that may be subject to investigation for unfair insurance trade practices, see 8 V.S.A. §§ 4722(1), 4723, 4724. According to Hamill, these statutes reflect a clear legislative policy to hold independent adjusters responsible for their conduct, in addition to any contractual obligations that they might have to the insurance carriers that employ them.

¶ 18. To be sure, the statutes Hamill cites reflect the Legislature's interest in affording some protection to the public by requiring adjusters to be licensed and subject to investigations regarding unfair insurance trade practices. This fact does not demonstrate, however, a legislative intent to create a duty on the part of adjusters that would form the basis for an independent tort action against them. Cf. *O'Connell*, 164 Vt. at 79, 665 A.2d at 43 (manual establishing procedures for ski accidents did not demonstrate assumption of duty to third parties); *Laroque v. State Farm Ins. Co.*, 163 Vt. 617, 618, 660 A.2d 286, 288 (1995) (mem.) (insurer's manual directing employees to investigate claims in efficient and cooperative manner did not create duty to particular claimant to process claim in good faith and consistent with manual). As we have recognized, "[a]lthough the Insurance Trade Practices Act, 8 V.S.A. §§ 4721-4726, provides administrative sanctions for unfair and deceptive acts within the insurance industry, including for unfair claim settlement practices, 8 V.S.A. § 4724(9), the Act does not create a private right of action." *Laroque*, 163 Vt. at 618, 660 A.2d at 288.

¶ 19. Moreover, no specific provision within the Insurance Trade Practices Act implies that adjusters in general, let alone independent adjusters in particular, owe a cognizable legal duty to insured policyholders. Indeed, the Act expressly provides that an independent

adjuster, in contrast to a public adjuster, "investigates claims and negotiates settlement of claims arising under policies of insurance *in behalf of insurers*." 8 V.S.A. § 4791(3) (emphasis added) (defining "Adjuster"); see *id.* § 4791(4) (defining "Public adjuster" as person who investigates, and negotiates settlement of, insurance claims "in behalf of the insured").

¶ 20. In light of the policy considerations discussed herein, we affirm the superior court's grant of summary judgment to defendant adjusters based on our determination that Hamill has no cause of action to recoup economic losses caused by defendants' alleged negligence in investigating Hamill's insurance claim. See *Lane v. Town of Grafton*, 166 Vt. 148, 150, 689 A.2d 455, 456 (1997) (when reviewing summary judgment motion, we apply same standard as trial court — summary judgment is appropriate when record clearly indicates that there is no genuine issue of material fact and moving party is entitled to judgment as matter of law).

*Affirmed.*