Long Trail House Condo. Ass'n v. Engelberth Constr., Inc., No. 581-11-08 Wmcv (Wesley, J., Sept. 1, 2011)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

**SUPERIOR COURT**                                     **CIVIL DIVISION**
**Windham Unit**                                        **Docket No. 581-11-08 Wmcv**


**Long Trail House Condominium
Association**


**v.**


**Engelberth Construction, Inc.**


**v.**


**Morgan's Roofing & Construction, et al.**


### Order Granting Defendant Engelberth's Motion for Summary Judgment and Order Denying Defendant Engelberth's Motion for Sanctions as Moot

Defendant/Third-Party Plaintiff Engelberth Construction Inc. has moved for summary judgment on all claims asserted by Plaintiff Long Trail House Condominium Association, asserting that the economic-loss rule and the absence of contractual privity with Engelberth doom Plaintiff's claims. Similar to past decisions rendered by this Court addressing almost analogous facts and allegations, the Court concludes, as a matter of law, that the economic loss rule prevents the Association's tort claims against Engelberth, as the Association is alleging economic losses, and no exception to the economic loss rule is available. Likewise, the Association's implied warranty claims fail as a matter of law since there is no contractual privity between the parties, and because Engelberth validly disclaimed any implied warranties running to successors in interest. Accordingly, the Court GRANTS Engelberth's Motion for Summary Judgment.

Additionally, because the Court's holding effectively dismisses Engelberth from this action, the Court will deny Engelberth's pending motion for sanctions against the Association as moot.

**Facts**

This suit arises from a construction project to erect a 143-unit condominium complex known as the Long Trail House at Stratton Mountain, Vermont. In January, 1997, Stratton and Engelberth entered into a Preconstruction Agreement ("the Preconstruction Agreement"), which articulated preconstruction terms and services that Engelberth was to supply Stratton, which included recommendations on construction feasibility, consultation as to the selection of materials and equipment, assisting with zoning requirements and permits, and cooperation with the "Design Team" to provide value engineering services. Further, under section 2 of the Preconstruction Agreement which outlined Engelberth's "extent of responsibility," Engelberth

explicitly disclaimed "responsibility to ascertain that the Drawings and Specifications are in accordance with applicable laws, statutes, ordinances, building codes, rules and regulations," and disclaimed responsibility for the Design Team's designs, errors or omissions.

Subsequently, on March 10, 1998, Engelberth and the Stratton Corporation and Intrawest Corporation (collectively "Stratton") the owners, entered into a Standard Owner and Contractor Form Agreement, (the "Agreement") with Modified General Conditions (appearing as "Exhibit B" to the Agreement), outlining the scope and terms of the project. Article 1.1.2 of the Modified General Conditions stated that:

> "The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. The Contract documents shall not be construed to create a contractual relationship of any kind . . . (3) between any person or entities other than the Owner and Contractor."

After construction was complete, Plaintiff Long Trail House Condominium Association ("Long Trail" or "the Association") notified Stratton of alleged defects associated with the construction of the Long Trail House, and of its position that Stratton was responsible for repairing the damaged elements of the complex. At first, the condominium unit owners experienced several minor problems with their units, most notably water leakage into the units, which caused damage to interior walls. The owners also complained of other water related issues, including peeling and chipping away of paint on the building, and rotting trim. In fact, the Association was forced repaint the building much sooner than expected, and also observed water damage around certain balconies which prompted the Association to undertake a comprehensive investigation of the Project.

Structural engineers consulting with both Stratton and the Association found significant further damage to the structure which would likely lead to personal property loss and personal injury if they were not promptly remediated. The engineers found that: 1) water continued to penetrate exterior walls; 2) trusses were improperly supported which could lead to roof collapse; 3) severe water damage to the balconies persisted which could result in their collapse within the next year; 4) load-bearing walls were unsupported and could collapse; and 5) gable end walls in the roof area of both the North and South building were not properly braced and could collapse in a high wind event, causing personal injury or significant property damage.

On or about May 2, 2007, Stratton, Intrawest, and the Association entered into a "Settlement Agreement and Release of Claims" through which the parties settled the Association's design and construction defect claims for $7,025,000. Section 4(c) of the Settlement specifically states that "Intrawest shall pursue a claim against Engelberth Construction, Inc. ("ECI") within two (2) years from the Date of this Agreement to recover part or all of the payment paid to the Association under the Agreement."

About a month later, Stratton filed suit against Engelberth, alleging that Engelberth was responsible for the construction defects observed in the buildings, the bulk of which was caused by water damage stemming from leaks throughout the building as a result of alleged faulty workmanship.

2

The Association thereafter retained contractors to conduct extensive remediation work, which cost approximately $1,500,000 more than the settlement amount. A year later, the Association filed the instant suit against Engelberth, charging Engelberth with negligence and breach of express and implied warranties. The defects alleged by the Association mirrored those in Stratton's lawsuit, and included additional claims related to other alleged defects in the buildings' HVAC and electrical systems with regard to elevators.

**Standard**

In order to prevail on a motion for summary judgment, the moving party must show that there is no genuine issue as to any material fact, and that it is entitled to judgment as a matter of law. V.R.C.P. 56(c)(3). The moving party has the burden of proof, and the opposing party must be given the benefit of all reasonable doubts and inferences in determining whether a genuine issue of material fact exists. *Price v. Leland*, 149 Vt. 518, 521 (1988). It is not the function of the court to weigh the probative effect of conflicting testimony; summary judgment must be denied if a genuine issue of material fact exists. *Baldwin v. Upper Valley Services*, *Inc.*, 162 Vt. 51 (1994).

**Analysis**

## I. The Economic Loss Rule Bars the Association's Negligence Claims.

As this Court has stated in a recent decision in another case with similar claims, tort/negligence actions are usually better suited for resolving claims for unanticipated physical/property injury, while the principles of contract law are generally better suited for determining claims for consequential damages that parties have or could have addressed by agreement. *Treetop at Stratton Condominium Assoc. v. Treetop at Stratton Dev. Co., et al.*, 147-3-09 Wmcv, at 3, (Vt. Super. Ct. Feb. 4, 2011) (Wesley, J.) (citing *Spring Motors Distribs. v. Ford Motor Co*., 489 A.2d 660, 672 (N.J. 1985)).

In keeping with these general policies for maintaining analytic clarity in the consideration of appropriate remedies, the economic loss rule was developed through common law to prohibit tort recovery for purely economic losses. See *Springfield Hydroelectric Co. v. Copp*, 172 Vt. 311, 314 (2001). The doctrine seeks to: (1) maintain the fundamental distinction between tort law and contract law; (2) protect commercial parties' freedom to allocate economic risk by contract; and (3) to encourage the party best situated to assess the risk of economic loss to assume, allocate, or insure against that risk. *1325 North Van Buren, LLC v. T-3 Group, Ltd.*, 716 N.W.2d 822, 831 (Wis. 2006). The economic loss rule applies to commercial disputes outside the confines of products liability, including the home construction defect context. See *Heath v. Wyatt*, 2006 VT 125, 181 Vt. 545.

### A. *The economic loss rule is still in effect in Vermont*

The Plaintiff first argues that the economic loss rule has been abandoned in many jurisdictions, and should likewise be abandoned by this Court. See Pl.'s Opp'n, p. 7 (citing cases

from Maryland, California, Colorado, Kansas, New Jersey, North Carolina, South Carolina, and Wisconsin). However, the Vermont Supreme Court has recently upheld the application of the economic loss rule, and has directly cited to authority from many other states to support this proposition. See *Heath v. Palmer*, 2006 VT 125, ¶15, 181 Vt. 545 (mem.) ("[the economic loss rule] is the general rule in most other jurisdictions, as well," citing to courts in Arizona, Idaho, Illinois, Kansas, Nevada, and Utah).[1] This Court concludes that the economic loss rule is still vital in this state.

### B. *The Association's alleged damages are pure economic loss not recoverable in tort*

Economic loss has been defined broadly to include damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits, as well as the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was sold or manufactured. *Redarowicz v. Ohlendorf,* 441 N.E.2d 324, 327 (Ill. 1982); *Heath v. Palmer*, 2006 VT 125, ¶ 15. Therefore, to recover in negligence, there must be a showing of harm above and beyond disappointed expectations, since a buyer's desire to enjoy the benefit of his bargain is not an interest that tort law traditionally protects. *Redarowicz*, 441 N.E.2d at 327.

In a recent case with similar litigants, facts, and causes of actions, this Court held that a condominium association's claimed damages stemming from latent construction defects were economic in nature, and not recoverable in tort as precluded by the economic loss rule. *Treetop*, No. 147-3-09 Wmcv, at 5. There, the damages consisted of costs for repair or replacement of portions of the condominium project caused by various deficiencies in construction, including roof leaks. Although the association in *Treetop* alleged that the deficiencies resulted in damage to "other property," and were therefore outside the grasp of the economic loss rule, this Court found such injury to the product itself within the scope of the rule. *Id.*

Similarly here, the damages alleged by Long Trail qualify as economic loss, precluding tort recovery. The claims consist almost entirely of costs of repair that stemmed from the alleged faulty construction, including: i) replacement of certain components of the complex that were properly installed and undamaged but which needed to be removed and replaced as part of the remediation, such as siding; and ii) costs incurred in relation to water damage to interior walls and painted surfaces inside specific units. Indeed, the amount sought from Engelberth represents the difference in market value between the units as built and as they should have been built. Here, the cost of remedy, encompassing all consequential damages, is the only recovery sought; that claimed recovery, however, represents pure economic loss.

Nonetheless, Long Trail argues that the damages it has incurred are not purely economic. The Association points to costs incurred due to damage to the interior of individual units such as water damage to interior walls and painted surfaces, and the removal/replacement of materials that were not defective in order to conduct repairs, such as the siding. As with *Treetop*, however,

---

[1] See also Def.'s Reply, n. 1, noting that the "majority of the cases [Plaintiff has cited] do not provide for support for [the proposition that the trend is in favor of abandoning economic loss rule], having either been distinguished or limited by more recent authority."

this effort is doomed when it attempts to classify as "other property" damage to any aspect of the "product" of the condominium construction contract in order to avoid the economic loss rule.

> C.  *Engelberth did not share a special relationship with the Association for purposes of the professional services exception to the economic loss rule*

Notwithstanding the scope of the economic loss rule, and as an exception to its effect, purely economic losses may be recoverable in professional negligence cases where the parties have a special relationship which creates a duty of care independent of contract obligations. *EBWS, LLC v. Britly Corp.*, 2007 VT 37, ¶ 31, 181 Vt. 513.  The Vermont Supreme Court has not specified which services could fall into such an exception. Rather, the Court has held that parties that "maintained complex and highly specialized responsibilities", but nevertheless "did not hold themselves out as providers of any licensed professional service," were not deemed "professionals" for purposes of the professional services/special relationship exception. *Springfield Hydroelectric Co. v. Copp,* 172 Vt. 311, 316-17 (2001).  Thus, the key is not whether one is licensed in a particular field, but rather the type of relationship created between the parties. *EBWS LLC*, 2007 VT 37, ¶ 31 (citing *Business Men's Assurance Co. v. Graham,* 891 S.W.2d 438, 453 (Mo. Ct. App. 1994) (allowing party to sue for purely economic damages in tort "if the party sues for breach of a duty recognized by the law as arising from the relationship or status the parties have created by their agreement")).

In *EBWS LLC,* the Court found that defendant presented itself as a construction contractor and not as a provider of a specialized professional service. *Id*. at ¶ 32.  The Court reasoned that plaintiff did not rely on defendant to provide it with a professional service, and paid for the services of a contractor and not a professional architect. *Id*. (citations omitted). Here, the Association claims that the services provided for by Engelberth under the Pre-Construction Agreement - which included providing advice as to: 1) value engineering; 2) the selection of materials, building systems, and equipment; 3) the "constructability" of the Project; and 4) design alternatives -  raised Engelberth's status from a general contractor to a professional providing professional services. Nevertheless, the Association has not persuaded the Court that these "extra" services propelled Engelberth into a status beyond that of a mere general contractor, or that the relationship between the parties can be distinguished from *EBWS LLC*. Indeed, both the Preconstruction Agreement, and the later Agreement between Stratton and Engelberth, reference third party architects/design teams expected to participate in the project. See Page #1 of Agreement (specifying "Graham Gund Architects" as the architect for the Long Trail project).  This reinforces the conclusion that Engelberth, in fact and by contract, functioned as a general contractor, and Plaintiff has established no sufficient facts to support its claim of reliance on specialized professional services distinct from Engelberth's general contractor role.

> D. *Engelberth did not owe a duty to the Association in tort because the Association may have been a foreseeable owner of Long Trail House*

Plaintiff next asserts that Engelberth owed the Association a duty of care independent of the contract.  Plaintiff argues that as a company offering professional services in the design, planning, coordination, and then actual construction of the Long Trail House, Engelberth was in a position in which it owed an independent duty of care not just to Stratton, but also to Long

Trail as a foreseeable end user. See *Council of Co-Owners Atlantis Condo., Inc. v. Whiting-Turner Contracting Co.*, 517 A.2d 335, 341 (Md. 1986). ("It is now a universal rule that the contractor is liable to all those who may be foreseeably injured by the structure … when the work is negligently done."). In reliance on such foreign authority, the Association asserts that it was reasonably foreseeable to Engelberth that Long Trail would take ownership of the very building that it was constructing, generating a common-law duty of care to Long Trail and its members to properly construct the building. Such duty, Long Trail maintains, did not arise from the Contract, but under the common law to properly construct a building that was in compliance with all relevant codes and not dangerous.

The Court can perceive only the subtlest distinction between the tort liability Plaintiff claims based on foreseeability, and the professional services exception to the economic loss rule just discussed above and found unavailing. Indeed, this Court has already rejected a similar "foreseeability" argument made against a general contractor and architect, and concludes that the instant circumstances are indistinguishable from the previous holding. See *Treetop,* 147-3-09 Wmcv (Feb 11, 2011) (Wesley, J.); *Mount Snow v. Grand Summit Resort Props., Inc.,* No. 564-12-03 Wmcv, at 8 (Vt. Super. Ct. Oct. 24, 2007) (Howard, J.) ("[W]hether there is a cognizable legal duty that supports a tort action depends on a variety of public policy considerations and relevant factors, only one of which is foreseeability. Ultimately, whether a duty exists is a question of fairness that depends on, among other factors, the relationship of the parties, the nature of the risk, and the public interest at stake."). Accordingly, the Court is not convinced that any such special relationship was created merely because the Association's eventual ownership was foreseeable to Engelberth, nor would it be fair to impute such a duty to Engelberth without clear evidence that such a duty was intended. The principles of contract law and the policies of risk allocation underlying the economic loss rule would be compromised by this gloss on the professional services exception, unless and until it is specifically acknowledged by the Vermont Supreme Court.

### E. The lack of privity between Engelberth and the Association does not render the economic loss rule inapplicable

The Association also argues that the economic loss rule is inapplicable here because there was no contractual privity between the Association and Engelberth, and thus, the Association could not negotiate the allocation of risks with Engelberth. The Association asserts that application of the rule would run contrary to and be inconsistent with the policy underlying the economic loss rule and tort law. The Association maintains that the economic loss rule is not meant to apply where it strips a plaintiff of tort remedies when it has no other recourse for addressing a breach of duty. Pl.'s Opp'n p. 8 (citing Vincent R. Johnson, *The Boundary-Line Function of the Economic Loss* Rule, 66 Wash. & Lee. L. Rev. 523, 584 (2009)).

Yet, as this Court has previously observed, Vermont courts have consistently applied the economic loss rule to disallow claims of economic loss to third parties absent privity of contract. See *Hamill v. Pawtucket Mut. Ins. Co.*, 179 Vt. 250, 253 (2005) (plaintiff insured's negligence claim against insurance adjuster for physical damage to property deemed purely economic losses recoverable under contract law and not tort); *Mount Snow v. Grand Summit Resort Props., Inc.*, No.564-12-03 Wmcv (Vt. Super. Ct. Mar.1, 2007) (Wesley, J.) (economic loss rule applied to

6

bar tort claims by a condominium owner's association against design professional despite lack of a contractual relationship).  See also *Davencourt at Pilgrim's Landing Homeowners Ass'n. v. Davencourt* , 221 P.3d 234, 243 (Utah 2009) (economic loss rule applied despite lack of opportunity to negotiate/allocate risks between association and developer and builder).

Moreover, this case provides a particular apt illustration to counter the claim that the economic loss rule operates unfairly to deprive injured claimants of any effective remedy. As recounted above, it is undisputed that the Association sought recourse directly against Stratton, the developer and seller, and realized a substantial settlement for the very matrix of construction defects it complains of in this case. That Plaintiff's current claim is based on a shortfall between the negotiated amount paid by Stratton, and the actual cost of remedial work, and does not establish any inadequacy in its choice of remedies that impugns the integrity of the economic loss doctrine.  There were doubtless many variables accounting for the amount negotiated between the Association and Stratton, including the need to estimate future costs in order to avoid litigation, but these are the very matters which the doctrine contemplates are best allocated in precisely this fashion: through the mechanisms of the original contracts and the subsequent negotiations appropriate to claims for contractual remedies.  That a party is left unhappy by the eventual result of such negotiations is not a sound basis for concluding that resort to additional tort claims against other parties more remote to the initial contract must be implied. This is the repeated teaching of economic loss jurisprudence, and this case affords, in this Court's view, a textbook example for the wisdom of its strictures.

The absence of direct contractual privity between the parties does not negate the economic loss rule, and the Court cannot ignore the contract expectations that existed among the condominium owners, the developer Stratton, and general contractor Engelberth.  To conclude otherwise would essentially impose the Plaintiff's economic expectations upon parties with whom Plaintiff did not deal, and alter the economic expectations created by contracts to which it was not a party.  See *Treetop,* 147-3-09, at 7; *Davencourt*, 221 P.3d at 243 (citations omitted).

*F. An Unreasonably Dangerous Condition Exception Cannot Be Established*

The Association further alleges that Engelberth's negligence created unreasonably dangerous conditions that prevent application of the economic loss rule.  The Association alleges that construction defects in the Long Trail House created the potential for substantial and imminent danger and damage to persons and property, although it is undisputed that no personal injury actually occurred.  The Association argues that the consequence of not responding to the structural defects found in the property would have created massive property damage and/or personal injury, and that it would not have been acting in the best interest or safety of its members, guests, or the general public if it had waited until a personal injury occurred before suing Engelberth for negligent construction.

Plaintiff's argument is misguided in several particulars, especially the failure to account for established precedent to the contrary.  As already noted, the resort to hyberbole is exposed by the inconvenient fact that the Association was able to obtain remediation costs from the party that it had contracted with, Stratton, which owed it a contractual duty to provide a product that complied with the express and implied warranties given at the time of purchase.  Indeed, the Vermont Supreme Court, has held that "warranty law would, in effect, be subsumed into tort law" if the court were to allow recovery for purely economic losses absent any physical harm

based solely on claims that an alleged defect *could* have endangered persons or their property. *Paquette v. Deere & Co.,* 168 Vt. 258, 264 (1998) (denying the availability of purely economic damages under theories of strict liability in the defective motor home context) (emphasis added).

## II. The Association's Contractual Claims Fail Due to it's Lack of Privity with Engelberth

Engelberth also moves for summary judgment on the Association's contract claims, arguing that because there is no contractual privity between Engelberth and the Association, there can be no sustained cause of action for breach of warranty. The Association responds that it is suing Engelberth for breach of implied warranties that run to a subsequent purchaser of improved real property, specifically the implied warranty against latent defects under the implied warranties of habitability and good workmanship. See *Beachwalk Villas Condo. Ass'n., Inc. v. Martin*, 406 S.E.2d 372, 374 (S.C.1991) ("we hold that architects may be held liable to homebuyers for negligence in connection with home construction projects and breach of implied warranty where no contractual privity exists between the architect and the homebuyer.").

The Association further argues that because there were no express disclaimers of any implied warranties that ran to subsequent purchasers of the units by Engelberth in the Preconstruction Agreement - unlike the express disclaimer of any contractual relationship between Engelberth and any third party in the General Conditions attached to the subsequent agreement between Engelberth and Stratton - there remains a question of fact as to whether any implied warranties that may run to the Association were in fact validly disclaimed. See Pl.'s Opp'n, p. 18 (citing 14 R. Powell et al., Powell on Real Property § 84A.06 [8], at 84A-62 (1994), (noting general rule that disclaimer of implied warranty for builder of home may be upheld if it is specific, conspicuous, and mutually agreed upon by all parties.)). However, this argument fails to account for the fact that the express terms of Article 1.1.2 of the Agreement state that the Agreement was the "entire and integrated agreement between the parties." Accordingly, the Court finds that this provision clearly and unambiguously provided that the Agreement superseded any prior agreement which may or may not have preserved an implied warranty to subsequent purchasers. Vermont's courts give effect to the intent of the parties as that intent is expressed in their writing. *Hamelin v. Simpson Paper (Vermont) Co.*, 167 Vt. 17, 19 (1997) (citation omitted). Moreover, when the contract language is clear, the intent of the parties is taken to be what the agreement declares. *Karlen Communications, Inc. v. Mt. Mansfield Television, Inc.,* 139 Vt. 615, 617 (1981).

Again relying on an analysis here replicated from previous rulings, the Court concludes that Vermont law requires privity in order to sustain a cause of action for breach of an implied warranty. Implied warranties arise from the business of selling rather than the business of manufacturing. *Bolkum v. Staab*, 133 Vt. 467, 470 (1975). Indeed, in the limited number of cases addressing this issue, Vermont courts have generally rejected the contention that warranties can be implied in the absence of a contract between the parties. See *Mainline Tractor & Equip. Co., Inc., v. Nutrite Corp.*, 937 F.Supp. 1096 (D. Vt. 1996) (lack of privity barred recovery in products liability case under implied warranty theories); *Kinney v. Goodyear Tire & Rubber Co.*, 134 Vt. 571 (1976) (express warranty claim not controlling on statute of limitations issue in products liability case because lack of privity barred warranty claim); *Mount Snow*, No. 564-12-

8

03 Wmcv (Vt. Super. Ct. Oct. 24, 2007) (Howard, J.) at 10 (underlying policies of the limitation on duty reflected in the economic loss rule would be undermined and effectively nullified if Court were to allow an action based on implied warranties despite the lack of a contractual right or duty); *Treetop*, No. 147-3-09 Wmcv, at 10 (Vt. Super. Ct. Feb. 4, 2011) (Wesley, J.) ("recognition of implied warranties [absent privity or any party guarantees] would have a corrosive effect on the policies furthered by the economic loss doctrine").  See also *Davencourt,* 221 P.3d.at 252 (Utah joining the "overwhelming majority of states" in requiring there be privity of contract in order to bring a claim for breach of implied warranty).

Further, whether or not a party is a third-party beneficiary is a matter of law and is based on the intention of the original contracting parties.  *Morrisville Lumber Co., Inc. v. Okcuoglu*, 148 Vt. 180, 184-85 (1987).  A party alleging third-party beneficiary status must present evidence indicating that the parties in privity entered into their agreement in contemplation of conferring a benefit on the third party.  *Id.; Hedges v. Durrance*, 175 Vt. 588, 590 (2003) ("plaintiff must prove that the primary purpose and intent of the [contractual] relationship was to benefit or influence the third party" in order to establish third-party beneficiary status).

In *Mount Snow*, this Court dismissed the association's claims against the architect, recognizing specifically that there was no privity of contract with the Association.  No. 564-12-03 Wmcv, at 4-5 (Orders of Mar. 7, 2007 and Oct. 24, 2007).  More recently in *Treetop*, this Court rejected the association's attempt to assert third-party beneficiary status, since Vermont law requires evidence that the contracting parties contemplated conferring a benefit on the third party.  Since there is no evidence in this case that the conferral of such a benefit on Long Trail was ever contemplated by the contracting parties, and in consideration of the clear and unambiguous language in the Agreement between Stratton and Engelberth that their contract created no contractual relationship of any kind between any persons or entities other than Stratton and Engelberth (Article 1.1.2), resolution of this issue is guided by this Court's holdings in *Mount Snow*  and *Treetop*, and accordingly, Engelberth's Motion for Summary Judgment as to the Association's contract claims is granted.

### III.    Defendant Engelberth's Motion for Sanctions is moot as a result of this decision.

Defendant Engelberth has also filed a Motion for Sanctions against the Association stemming from a deposition of Association President Sidney Stein, a 30(b)(6) witness produced by the Association.  Engelberth charges that Mr. Stein was inadequately prepared for this deposition, despite Engelberth's requests that the Association's 30(b)(6) witness be able to testify as to certain pre-specified matters.  The Association responds by alleging that Engelberth's requests were unreasonable, and that Engelberth has failed to engage in good-faith negotiations with the Association to settle this discovery dispute prior to seeking the Court's intervention.  Without inquiring further into the merits of the parties' contentions, the Court concludes that its decision granting Defendant summary judgment effectively moots the request for sanctions.

# ORDER

**WHEREFORE** it is hereby **ORDERED**:

Defendant Engelberth's Motion for Summary Judgment is **GRANTED.**
Defendant Engelberth's Motion for Sanction is **DENIED** as moot.

Dated at Newfane, Vermont this   1st    day of September, 2011.

_____
John P. Wesley
Presiding Judge