NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2017 VT 35

No. 2016-270

| | |
|---|---|
| William Strong | Supreme Court |
| | |
| v. | On Appeal from Superior Court, Chittenden Unit, Civil Division |
| | |
| Edward D. Fitzpatrick and Bergeron, Paradis & Fitzpatrick, LLP | March Term, 2017 |

Helen M. Toor, J.

Matthew D. Anderson and Shannon E. Lamb of Pratt Vreeland Kennelly Martin & White, Ltd., Rutland, for Plaintiff-Appellant.

Justin B. Barnard of Dinse, Knapp & McAndrew, P.C., Burlington, for Defendants-Appellees.

PRESENT: Reiber, C.J., Dooley, Skoglund and Robinson, JJ.

¶ 1. **REIBER, C.J.** In this legal malpractice case, plaintiff claims that his deceased mother's attorney failed to draft a will reflecting her alleged intent to leave plaintiff a greater share of real estate than that left to his siblings. Plaintiff appeals the trial court's summary judgment decision for defendant, arguing that defendant owed him a duty of care as a prospective beneficiary of his mother's estate. We disagree and therefore affirm.

¶ 2. Plaintiff's mother married plaintiff's stepfather in 1966. Mother had three children when she married stepfather: plaintiff and his two siblings. Stepfather had no children, but he owned land known as the Munson Homestead, which had been built in 1834 by the first of seven generations of his family to live there. The Homestead consisted of two sections: (1) a portion

where the house was situated (House Portion), and (2) a large tract of undeveloped land (Upper Meadow). Plaintiff and his siblings lived on the Homestead until early adulthood. Plaintiff returned to the Homestead in 1992 to care for mother and stepfather and to maintain the Homestead. During this time, plaintiff claims that "[o]n more than one occasion," stepfather told plaintiff that he wanted plaintiff "to inherit the entire Munson Homestead" when stepfather and mother died. Plaintiff lived on the Homestead until mother's death in 2012.

¶ 3. Meanwhile, stepfather died in 2000, and mother inherited the entire Homestead. In anticipation of this inheritance, mother had executed a will in 1999 that would leave the entire Homestead to her three children in equal shares. Plaintiff was "distraught" about this plan and testified that he discussed it with mother in 2002 or 2003. He told mother that he "had done a lot of work to the place" and that her plan "wasn't what [he] was told" by stepfather. Plaintiff contends that mother responded, "I will leave you the house, the barn and the lower meadow, and you three kids can divide up the upper field"—in other words, she would leave the House Portion exclusively to plaintiff, and the Upper Meadow to all three of her children.

¶ 4. In 2006, mother hired defendant to help with the potential sale of the Upper Meadow to a developer for over $1,000,000. Plaintiff claims that this sale was intended to "ease facilitation of her primary estate planning objective" which he says at that point was to leave the House Portion to plaintiff and the rest of her property divided among her three children. Although the sale to the developer fell through, defendant did draft a codicil to her 1999 will to assist with her estate planning. This codicil named defendant as the executor of mother's estate but did not change the disposition of her property.* However, according to defendant, he later met with mother in February 2010 and she "indicated" to defendant that she "would like" plaintiff to inherit the

---

* Defendant never served as executor of mother's estate. Plaintiff did. Defendant entered an engagement agreement with plaintiff to represent him in his capacity as executor.

2

entire House Portion and split the Upper Meadow with his two siblings. Indeed, after mother's death, defendant wrote a letter to plaintiff in August 2013 about this meeting:

> I met with your mother in February of 2010. She had contacted me and indicated that she wanted to make a change to her will. We met in her kitchen. She explained to me that she wanted [plaintiff] to have the corner piece where the house is, being about [two] acres. The upper meadow was to be sold and split equally amongst her three children.

Nevertheless, defendant described the meeting as merely "a consult" and that no decisions were made to move forward with the contemplated changes; indeed, he testified that "even in the beginning, she never asked me to [revise the will]. She never said, change my will."

¶ 5. In September 2011, defendant again met with mother regarding her will. Defendant maintains that mother was concerned about plaintiff's ability to pay the taxes on the House Portion, in addition to his share of the taxes on the Upper Meadow. It is disputed whether plaintiff was present at this meeting. Plaintiff insists that mother instructed defendant to draft a codicil and that defendant responded that he would go back to his office and draft the papers for her to sign. But there was never any further communication between defendant and mother after that meeting.

¶ 6. In March 2012, mother fell ill and was hospitalized. Plaintiff testified that he called defendant: "I told him that my mother was dying; that, she wants you to come down to the hospital and bring the will for her to sign." Defendant did not do this. Instead, he drafted and executed a Power of Attorney authorizing plaintiff to handle mother's affairs. Mother died on March 31, 2012, without executing a codicil leaving the House Portion to plaintiff. The entire Homestead was sold, and the proceeds were split between plaintiff and his siblings according to the terms of mother's 1999 will.

¶ 7. Plaintiff then filed a complaint against both defendant and his law firm alleging that defendant committed legal malpractice and consumer fraud. Specifically, plaintiff alleged that defendant breached a duty of care by failing to advise mother on matters of her estate and failing

3

to draft a codicil reflecting her intent. The court granted a partial motion to dismiss by defendants in June 2015, dismissing the consumer fraud allegation. In February 2016, plaintiff filed an amended complaint, adding another count of legal malpractice. This amended complaint alleged that defendant breached a duty owed to plaintiff to the extent that he could have successfully challenged mother's will. According to plaintiff, he filed six affidavits from mother's relatives, friends, and neighbors indicating that mother was committed to leaving the House Portion to plaintiff.

¶ 8. In April 2016, defendants filed a motion for summary judgment in which they argued that an attorney does not owe "a duty to a non-client prospective beneficiary of a nonexistent will or other estate planning document." Plaintiff opposed this motion, conceding that "[w]hile we do not have any Vermont decisions directly on point . . . it seems highly likely that the Vermont Supreme Court will join the group of progressive jurisdictions" that use a multi-factor analysis to determine whether a duty exists in the estate-planning context. After a hearing, the court granted defendants' motion in July 2016, ruling that there is no duty to beneficiaries of a client's estate under Vermont law: "Although . . . other jurisdictions have relaxed the privity rule in some cases involving third-party beneficiaries, Vermont has not yet done so."

¶ 9. Plaintiff now appeals, arguing that (1) "the absence of strict privity of contract between will beneficiaries and their benefactors' estate planning lawyer should not serve to automatically bar the beneficiaries from obtaining redress for lawyer errors that deprive them of inheritances" and (2) "if an attorney owes a duty of care to intended beneficiaries of estate planning legal services the duty must encompass an obligation to complete a contracted-for will, already begun, in a reasonable amount of time, or at least obligate the lawyer to inform the client that he will not complete the drafted will so that client can hire another lawyer to do the work." We hold that attorneys do not owe a duty to non-client prospective beneficiaries of undrafted, unexecuted

4

wills and therefore do not recognize an exception here to the general rule requiring attorney-client privity to maintain a legal malpractice action.

¶ 10. We review the court's grant of summary judgment de novo, affirming it only if we determine that the moving party showed that there was no genuine issue of material fact and that it was entitled to judgment as a matter of law. V.R.C.P. 56(a); White v. Quechee Lakes Landowners' Ass'n, Inc., 170 Vt. 25, 28, 742 A.2d 734, 736 (1999) ("In reviewing a decision to grant summary judgment, we apply the same standard as the trial court, requiring the moving party to prove both that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law."). And to determine whether a genuine issue of material fact exists, we regard "as true all allegations of the nonmoving party supported by admissible evidence" and give "the nonmoving party the benefit of all reasonable doubts and inferences." Powers v. Hayes, 172 Vt. 535, 536, 776 A.2d 374, 375 (2001) (mem.).

¶ 11. To sustain a legal malpractice action, a plaintiff must prove that the defendant attorney was negligent and that this negligence was the proximate cause of the plaintiff's harm. Fritzeen v. Gravel, 2003 VT 54, ¶ 8, 175 Vt. 537, 830 A.2d 49 (mem.). Generally, an attorney owes a duty of care only to his or her own client; not to third parties who claim to have suffered from the attorney's negligence. See, e.g., Hedges v. Durrance, 2003 VT 63, ¶ 6, 175 Vt. 588, 834 A.2d 1 (mem.) ("[A]n attorney owes a duty of care only to the client and not to third parties."); Bovee v. Gravel, 174 Vt. 486, 487, 811 A.2d 137, 139-40 (2002) (mem.) ("The longstanding common law rule is that an attorney owes a duty of care only to the client, not to third parties who claim to have been damaged by the attorney's negligent representation."); see also Savings Bank v. Ward, 100 U.S. 195, 200 (1879) ("Beyond all doubt, the general rule is that the obligation of the attorney is to his client and not to a third party . . . .").

¶ 12. This general rule requiring attorney-client privity to maintain a legal malpractice action was developed to ensure that an attorney may focus on the privileged attorney-client

5

relationship and on the client's objectives without interference or the looming possibility of suit from third parties. Hedges, 2003 VT 63, ¶ 9 ("[A] risk of divided loyalties could negatively affect an attorney's ability to exercise independent judgment in achieving an advantageous outcome for the client."); Bovee, 174 Vt. at 488, 811 A.2d at 140 ("The requirement of attorney-client privity to maintain a malpractice action 'ensure[s] that attorneys may in all cases zealously represent their clients without the threat of suit from third parties compromising that representation.' " (quoting Barcelo v. Elliott, 923 S.W.2d 575, 578-79 (Tex. 1996))); Orr v. Shepard, 524 N.E.2d 1105, 1108 (Ill. App. Ct. 1988) ("Public policy mandates that when an attorney acts in his [or her] professional capacity, he [or she] must be free to advise his [or her] client without fear of personal liability to third persons and nonclients if the advice later proves to be incorrect."). Indeed, the traditional thinking has been that expanding liability to beneficiaries could even introduce a potential interference with the ethical obligations an attorney owes to his or her client. See V.R.Pr.C. 1.7. cmt. 1 ("Loyalty and independent judgment are essential elements in the lawyer's relationship to a client. Concurrent conflicts of interest can arise from the lawyer's responsibilities to . . . a third person . . . .").

¶ 13. Nevertheless, as this Court has previously observed, courts around the country have made exceptions to the general rule, often in the estate-planning or will-drafting context. See, e.g., Hedges, 2003 VT 63, ¶ 7 ("Many courts have held lawyers liable to nonclient plaintiffs for negligence where the plaintiff is an intended third-party beneficiary of the attorney-client relationship—in estate-planning and will-drafting cases for example."); Bovee, 174 Vt. at 488, 811 A.2d at 140 ("[A] number of courts have relaxed the privity rule in limited circumstances—most often in the estate-planning context—where it can be shown that the client's purpose in retaining the attorney was to directly benefit a third party."). Indeed, in Vermont, a third party may sustain an action against an attorney for negligent misrepresentation, so long as the third party demonstrates "a relationship so close as to approach that of privity." Hedges, 2003 VT 63, ¶ 10

6

(quoting Bovee, 174 Vt. at 489, 811 A.2d at 142). But this case does not involve any claimed negligent misrepresentation, and we have always been cautious of any expansion of the exceptions to the general rule regarding privity. See, e.g., id. ¶ 9 ("A dramatic expansion of the requirements regarding privity and duty of care would have profound consequences."). It is in light of this historically cautious approach that plaintiff now asks that we recognize a new exception to the general rule by imposing on attorneys a duty to prospective beneficiaries of undrafted, unexecuted wills.

¶ 14. In support of this argument, plaintiff advocates that this court adopt a multi-factor test first used in a California Supreme Court case for determining whether, in a particular transaction, an attorney owes a duty to a third party. See Lucas v. Hamm, 364 P.2d 685 (Cal. 1961). These factors include "the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him [or her], the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury, and the policy of preventing future harm." Id. at 687.

¶ 15. Plaintiff's argument in support of the Lucas multi-factor test largely rests on public policy and a belief that we should align Vermont's estate-planning law with that of supposedly like-minded states. In his view, "[t]he strict privity requirement was manifestly unfair, a relic of a bygone common law of torts overtly hostile to plaintiffs of all types," and so Vermont "should join other progressive jurisdictions" that apply the Lucas multi-factor test for analyzing the existence of a duty. He further states that this Court should be open to using the multi-factor analysis in the estate-planning context because we have previously recognized that whether a duty exists in the general tort context depends on a number of factors. See Hamill v. Pawtucket Mut. Ins. Co., 2005 VT 133, ¶ 6, 179 Vt. 250, 892 A.2d 226 (noting that whether duty exists in general tort context is "a question of fairness that depends on, among other factors, the relationship of the parties, the nature of the risk, and the public interest at stake"); see also Langle v. Kurkul, 146 Vt. 513, 520,

7

510 A.2d 1301, 1305-06 (1986) ("Our Court should not recognize a new cause of action or enlarge an existing one without first determining whether there is a compelling public policy reason for the change.").

¶ 16.    But we decline to explore adoption of the Lucas factors or any other specific multi-factor test on these facts.  Lucas is different from the case at hand.  In Lucas, the testator engaged the defendant attorney to prepare a will that would produce a residual trust designating the plaintiffs as beneficiaries.  That is a significant difference.  There, the will was fully drafted and properly executed, but the residual trust provision that was included within the testamentary document was determined to be invalid after the testator's death because of certain statutory restraints on alienation and the rule against perpetuities.  The court ultimately determined that the plaintiffs had a valid cause of action against the defendant attorney.  Id. at 689.

¶ 17.    Plaintiff likewise further points to other cases in which courts have allowed suits by beneficiaries against attorneys contracted to prepare wills; plaintiff argues that the courts allowed these suits because "the client and the third-party beneficiary have exactly the same interest in seeing the contracted-for-will completed."  See Mieras v. DeBona, 550 N.W.2d 202, 206 (Mich. 1996) ("Because the interests of a lawyer's client and the persons he [or she] intends to benefit in his [or her] will are parallel . . . no conflict of interest would arise as a result of recognition of an obligation on the part of a lawyer to draft a will in accordance with his [or her] client's instructions."); Needham v. Hamilton, 459 A.2d 1060, 1062 (D.C. 1983) ("This is not a case in which the ability of a nonclient to impose liability would in any way affect the control over the contractual agreement held by the attorney and his client, as the interests of the testatrix and the intended beneficiary with regard to the proper drafting and execution of the will are the same."); Blair v. Ing,  21 P.3d 452, 467 (Haw. 2001) ("[I]mposition of a duty will not create the potential conflict of interest argued by [the defendant]").  This, plaintiff argues, couples with his

8

claim that mother's testamentary intent was to benefit plaintiff's interest to inherit the entire House Portion of her estate.

¶ 18.    But plaintiff's case is different from those he cites.  Those cases are all premised on claims of negligent drafting of a final document, either a properly executed will or some other trust document.  See generally Mieras, 550 N.W.2d 202 (testator's children brought action against attorney for failing to include provision in signed will to exercise power of appointment to exclude testator's third child, in derogation of testator's instructions); Needham, 459 A.2d 1060 (nephew brought action against attorneys after they erroneously removed will provision naming nephew as sole residuary beneficiary and testator executed will before her death); Blair, 21 P.3d 452 (children brought action against attorney over trust agreement alleging that although agreement created bypass trust, attorney negligently drafted document by failing to include proper funding formula, resulting in entire estate being subject to federal and state taxes upon death of parents).

¶ 19.    Plaintiff's case is not about negligent drafting but rather about the absence of any drafting.  Because it is premised on the claim that defendant should have drafted a new will for mother, his position is that of a prospective beneficiary of an undrafted, unexecuted will.  We reject plaintiff's request to extend an exception to the general rule to the circumstances of this case; imposing on attorneys a duty to prospective beneficiaries of undrafted, unexecuted wills would undermine the duty of loyalty that an attorney owes to his or her client and invite claims premised on speculation regarding the testator's intent.

¶ 20.    As previously noted, a diluted duty of loyalty is one of the main reasons courts have been reluctant to impose on attorneys a duty to beneficiaries.  The risk of a diluted duty of loyalty is present in this case.  As other courts have noted, imposing on attorneys a duty of care to prospective beneficiaries could pressure those attorneys to promptly or summarily execute a will to benefit the prospective beneficiaries.  And this pressure would be directly counter to those attorneys' interest in ensuring that testators have sufficient time to consider the disposition of their

9

property. Indeed, attorneys could even be left in the position of pushing testators to execute their wills hastily and without sufficient consideration, for fear of liability to those prospective beneficiaries. See Sisson v. Jankowski, 809 A.2d 1265, 1269 (N.H. 2002) ("Whereas a testator and the beneficiary of a will have a mutual interest in ensuring that an attorney drafts the will non-negligently, a prospective beneficiary may be interested in the will's prompt execution, while the testator or testatrix may be interested in having sufficient time to consider and understand his or her estate planning options."); Krawczyk v. Stingle, 543 A.2d 733, 736 (Conn. 1988) ("Imposition of liability would create an incentive for an attorney to exert pressure on a client to complete and execute estate planning documents summarily."). This risk does not exist in other contexts where courts have made an exception to the general rule, such as those cases where attorneys drafted wills or other estate-planning documents negligently and not in conformity with the testators' intent. Cf. Mieras, 550 N.W.2d 202; Needham, 459 A.2d 1060; Blair, 21 P.3d 452.

¶ 21. Likewise, imposing a duty to prospective beneficiaries of undrafted, unexecuted wills could invite claims premised on improper speculation regarding the testator's intent. This risk is particularly high in the estate-planning context because the primary witness who could speak to testamentary intent is deceased when a claim is made. Moreover, even if a testator has made note of his or her intent through declarations to relatives, friends, neighbors and the like—as is asserted in this case—that intent may change over time during the estate-planning process. See Radovich v. Locke-Paddon, 41 Cal. Rptr. 2d 573, 582 (Cal. Ct. App. 1995) ("[C]ommon experience teaches that potential testators may change their minds more than once after the first meeting."). Acknowledging this, the Massachusetts Supreme Judicial Court has noted that the "psychological" effect of being confronted with one's will can cause a "change of heart" in the testator:

> A client who engages an attorney to prepare a will may seem set on
> a particular plan for the distribution of her estate, as here. It is not
> uncommon, however, for a client to have a change of heart after

10

reviewing a draft will. Confronting a last will and testament can produce complex psychological demands on a client that may require considerable periods of reflection. An attorney frequently prepares multiple drafts of a will before the client is reconciled to the result.

Miller v. Mooney, 725 N.E.2d 545, 550-51 (Mass. 2000).

¶ 22. It is for these reasons that Vermont law requires more evidence of a testator's commitment than a direction to modify a will; strict execution requirements exist to provide proof of testamentary intent and capacity and to prevent fraud. See 14 V.S.A. § 5 ("[A] will shall not pass any real or personal estate, or charge or affect the same, unless it is in writing and signed by the testator . . . ."); see also In re Estate of Cote, 2004 VT 17, ¶ 11, 176 Vt. 293, 848 A.2d 264 ("The obvious purpose of [the requirements of 14 V.S.A. § 5] is to supply ample evidence of the decedent's testamentary intent and capacity and to prevent fraud."). Deviating from these requirements when the testator's intent is not clearly expressed in a properly executed will would require the court to speculate as to what the testator's ultimate intent would have been had he or she executed one. See Cheng v. Lederman, 90 Cal. Rptr. 3d 758, 774 (Cal. Ct. App. 2009) (holding that lawsuits based on duty to prospective beneficiaries would "inevitably be speculative"). We therefore decline to recognize a duty to prospective beneficiaries of undrafted, unexecuted wills.

Affirmed.

FOR THE COURT:

_____

Chief Justice