NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 21

No. 2014-330

| | |
|---|---|
| William Deveneau | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Bennington Unit, |
| | Civil Division |
| | |
| Susan Wielt and Brian Toomey | March Term, 2015 |

John P. Wesley, J.

Ron F. Wright of The Wright Firm, LLC, Bennington, for Plaintiff-Appellant.

Joslyn L. Wilschek and Leo A. Bisson of Primmer Piper Eggleston & Cramer PC, Montpelier, for Defendant-Appellee Toomey.

PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1.    **SKOGLUND, J.**    Plaintiff was injured when he struck a horse while driving on Vermont Route 7A. The horse belonged to Susan Wielt, who leased a house and land from Brian Toomey. Plaintiff sued Wielt and Toomey for negligence. Toomey moved for summary judgment, arguing he had no duty to keep the horse enclosed or to prevent its escape. The trial court granted summary judgment, and plaintiff appeals. We hold that Toomey owed no duty to plaintiff and affirm.

¶ 2.    In 2008, Wielt leased a house and land from Toomey at 1900 Harwood Hill, also known as Route 7A, in Bennington. Toomey gave Wielt permission to keep two horses, an Arabian mare and a thoroughbred, on the property and to pasture them there. Toomey also

owned a parcel adjacent to 1900 Harwood Hill, identified as 1952 Harwood Hill. Toomey allowed Wielt to pasture her two horses on the 1952 lot as well, on the condition that Wielt take responsibility for all care of the horses and maintain a fence to keep them enclosed. Wielt pastured her horses on both lots, alternating the lots for grazing purposes.

¶ 3. Wielt constructed and maintained a temporary electric fence to contain her horses, consisting of two strands of nylon wire attached to five-foot-high fiber glass posts that were driven six inches into the ground. Toomey passed by the horses and the fence on his way to the grocery store, but he never rode or used the horses, and never inspected or maintained the fence. Nor was he knowledgeable as to the design or construction of the fence. Toomey had no knowledge of any instance when a horse escaped or if the fence was in disrepair prior to the night of the accident.

¶ 4. On the night of the accident, around 1:00 a.m., plaintiff was driving home from work along Vermont Route 7A and passed by the lot where the horses were being kept. He saw a large moose-like animal in the road; he swerved and hit his brakes but could not avoid colliding with the animal. The animal crushed the windshield and top of plaintiff's vehicle injuring plaintiff. Plaintiff later discovered that the animal was Wielt's thoroughbred.

¶ 5. The trial court found that the record did not include sufficient evidence to establish how the horse escaped the fenced-in lot. The responding officers observed a gate was down and the wire sagged on parts of the fence. The fence was electrified, at least in part, through solar power; however, the record did not establish whether the fence was circulating electricity at the time of the collision.

¶ 6. Plaintiff sued both Wielt and Toomey for negligence. Toomey moved for summary judgment, arguing that he owed no duty of care to plaintiff to prevent the escape of Wielt's horse. The trial court granted summary judgment to Toomey, concluding that a landowner does not have a duty to inspect or maintain fences erected by a tenant for the tenant's

2

horse, absent some showing of facts making it foreseeable that the horse might escape. Plaintiff appeals.

¶ 7.    "We review summary judgment rulings de novo, using the same standard as the trial court." Demag v. Better Power Equip., Inc., 2014 VT 78, ¶ 9, 197 Vt. 176, 102 A.3d 1101. "Summary judgment should be granted when, taking all the allegations made by the nonmoving party as true, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Rubin v. Town of Poultney, 168 Vt. 624, 625, 721 A.2d 504, 506 (1998) (mem); V.R.C.P. 56(a).

¶ 8.    Our question on appeal is: What duty, if any, runs from Toomey, as noncustodial landowner, to plaintiff? Vermont common law imposes a general duty of ordinary care: to act as a reasonably prudent person would in similar circumstances. But "whether there is a cognizable legal duty that supports a [particular] tort action depends on a variety of public policy considerations and relevant factors." Hamill v. Pawtucket Mut. Ins. Co., 2005 VT 133, ¶ 6, 179 Vt. 250, 892 A.2d 226. It is "a question of fairness that depends on, among other factors, the relationship of the parties, the nature of the risk, . . . the public interest at stake," and the foreseeability of the harm. Id. Implicit in these considerations is the "basic tort rule that duty is measured by undertaking." Murphy v. Sentry Ins., 2014 VT 25, ¶ 42, 196 Vt. 92, 95 A.3d 985 (quotation omitted). The existence of a duty "is primarily a question of law." O'Connell v. Killington, Ltd., 164 Vt. 73, 76, 665 A.2d 39, 42 (1995). Absent a duty of care, an action for negligence fails. Id.

¶ 9.    Although this case presents an issue of first impression, our decision in Wright v. Shedd provides a solid foundation for our analysis here. 122 Vt. 475, 177 A.2d 240 (1962). In Wright, a horse owned by Shedd wandered onto a road and was struck by a vehicle driven by plaintiff, resulting in injuries to plaintiff. This Court affirmed the dismissal of one of the defendants, Shedd's wife, noting there was no "evidence to connect her with the ownership,

3

management or control of the horses that were involved in the accident." Id. at 477, 177 A.2d at 242. And we affirmed negligence with respect to the other defendant, Shedd, because "it was clear that [he] had the responsibility of ownership and control of the horse that precipitated the accident." Id. at 478, 177 A.2d at 242. It was uncertain in Wright who owned the land from where the horses escaped, but this Court's inquiry regarding the dismissed defendant did not extend to whether she may have owned the pasturing land. Thus, while Wright did not go so far as to absolve all landowners of the duty to prevent harm from horses that escape from their property, it implied that such a duty will not attach absent some involvement in the ownership, management, or control of the horse. Ownership of the land was not enough.

¶ 10. This view is in line with centuries of Vermont statutory law. A 1797 statute read in relevant part, "[I]f the owner or keeper of any stone horse or stallion . . . shall willfully or negligently suffer such stone horse or stallion to run at large, . . . such owner or keeper shall forfeit and pay a sum." 1797 V.S. § 10. That law has remained largely unchanged, even though the Legislature has taken care to update language and make minor changes over the years, even as recently as 1997. The current version is codified at 20 V.S.A. § 3349(a) and states in relevant part: "An owner or keeper of a stallion, . . . who willfully or negligently permits such stallion to run at large out of the enclosure of such owner or keeper, shall be fined . . . and shall also be liable to a party injured for the damage done by such stallion while running at large." Other Vermont provisions similarly demonstrate the Legislature's intent that only the horse's "owner or keeper" is liable in a civil action for damages suffered as a result of a horse's escape. See, e.g., 20 V.S.A. § 3345 ("A person who knowingly permits his cattle, horses, sheep, goats, swine, or domestic fowls to go upon the lands or premises of another . . . shall be fined . . . . Such person shall also be liable for the damages suffered which may be recovered in a civil action."); 24 V.S.A. § 3807 ("owner or keeper" of stray animal liable in tort for damage done to lands of others).

4

¶ 11.　The courts of many other states limit the scope of duty in such cases to people or entities involved in the ownership or control of the injurious farm animal.  In <u>Blake v. Dunn Farms, Inc.</u>, 413 N.E.2d 560 (Ind. 1980), a car struck a horse that wandered onto a road at night. The driver sued the owner of the horse and the landowner.  The court held, "If the landowner is neither the owner nor keeper, he has no duty to confine or restrain the animal." <u>Id</u>. at 565; see also <u>Jacobs v. Stover</u>, 243 N.W.2d 642, 644 (Iowa 1976) (affirming summary judgment to landowner where parties admitted landowner had no duty to fence livestock); <u>Sutton v. Duke</u>, 176 S.E.2d 161, 169-70 (N.C. 1970) (denying landowner's motion to dismiss because court lacked knowledge about landowner's involvement with escaped animal); <u>Clauson v. Kempffer</u>, 477 N.W.2d 257, 261 (S.D. 1991) (affirming summary judgment in negligence action to noncustodial landowner where tenant owned horses that precipitated accident and controlled fencing).

¶ 12.　Plaintiff relies on an opinion from New York's highest court, <u>Hastings v. Suave</u>, 989 N.E.2d 940, 942 (N.Y. 2013), which appears to directly contradict the above decisions.  We find that authority unpersuasive.  In that case, the plaintiff was injured when her van hit a cow on a public road.  The three defendants were the two owners of the cow and the owner of the land where the cow was being kept.  The <u>Hastings</u> court focused largely on a point of law irrelevant to this case—whether the vicious-propensity rule barred a negligence action—and only superficially discussed the issue of the defendants' liability in negligence.  The court summarily held that an animal's owner or the landowner could be liable under "ordinary tort-law principles" when the animal is negligently allowed to stray from the property on which it is kept.  <u>Id</u>. at 942. But the court did not mention whether the landowner had any contractual responsibility to care for the cow or maintain the fence, and it provided no reasons for attributing possible liability to the landowner.

¶ 13. We find equally unpersuasive the New York Appellate Division case cited by plaintiff, which cites affirmatively to Hastings. In Sargent v. Mammoser, 986 N.Y.S.2d 728 (N.Y. App. Div. 2014), a cow wandered from a farm onto a road, fatally injuring a motorcycle operator. Both the farm and cow were owned by the lone defendant. The court reversed the lower court's dismissal of the motorcyclist's complaint, which was based on common-law negligence. Id. at 730. In doing so, the court merely recited the facts and holding of Hastings, and then held that triable issues of fact with respect to the defendant's negligence existed based on the defendant's own testimony that there was a break in the fence on the night of the accident and that there had been previous breaks in the fence that had to be repaired. Id. Further, affidavits from the defendant's neighbors averred that the escape of the cows was a recurring problem and the affidavit of the plaintiff's expert opined that the defendant's fence was inadequate. The case is inapposite because it did not parse landowner and animal-owner liability; the defendant clearly was the only person in control of the land, the fence, and the cow.

¶ 14. Plaintiff also contends that an inadequately contained horse creates a dangerous condition on a property, and that we should apply duty principles from various condition-of-property cases. See, e.g., Demag, 2014 VT 78, ¶ 3 (negligence action based on injuries from falling in uncovered storm drain on landlord's premises); Murray v. Nelson, 97 Vt. 101, 101, 122 A. 519, 520 (1923) (negligence action based on injuries from slipping on icy sidewalk caused by faulty water pipes in landlord's building). We decline to use those principles because we can decide this case solely within control-of-animals precedents. Moreover, holding that pasturing horses creates a dangerous condition on property would disregard strong public policy supported by this state's agricultural character. See Hamill, 2005 VT 133, ¶ 6 (noting that existence of duty depends in part on public interest at stake).

¶ 15. Plaintiff additionally argues that landowner owes a duty pursuant to Restatement (Second) of Torts § 379A (1965). Under that provision, a landowner may be liable to persons

6

outside of the land caused by activities of the tenant "if, but only if," the landowner "knew or had reason to know that it would unavoidably involve such an unreasonable risk, or that special precautions necessary to safety would not be taken." Id. The comments to the section explain that it is "closely related to liability of the lessor for a nuisance on the land." Id. cmt. a. They note further that:

> [I]f the unreasonable risk is not a necessary consequence of the contemplated activities of the lessee, and such activities could normally be conducted without creating the unreasonable danger to those outside of the land by taking precautions, the lessor is not liable unless he knows or has reason to know that the lessee intends to carry on the activity without taking precautions.

Id. cmt. c. The Restatement provides an illustration of these principles:

> A leases land to B for use as a baseball park. At the time of the lease A knows that there is an unreasonable risk that in the ordinary course of a baseball game balls will be hit into the public highway in a manner dangerous to those using it. After B enters into possession, and in the course of a baseball game, a ball is hit into the highway, crashes into the windshield of an automobile, and injures C, the driver. A is subject to liability to C.

Id. cmt. c, illus. 1. We cannot similarly say there is an unreasonable risk in the ordinary course of pasturing that horses contained by a fence will escape and pose a danger to passing motorists. When Toomey allowed Wielt to keep horses on his land on the condition that she maintain a fence to keep them contained, he could reasonably assume that an "unreasonable risk [was] not a necessary consequence," and that "such activit[y] could normally be conducted without creating . . . unreasonable danger to those outside the land."[1]

---

[1] The dissent neglects to explain that in Misterek v. Wash. Mineral Prods., Inc., 531 P.2d 805 (Wash. 1975) (en banc), the court was addressing a situation where, not only did the corporate owner know that the fences were in need of repair for over four years, but also the area where the land was situated was in a stock restricted area. That fact informed much of the decision, as the violation of that statute was considered negligence as a matter of law. Such was the case in Larson-Murphy v. Steiner, 2000 MT 334, 15 P.3d 1205, also relied upon by dissent. The legal argument centered on whether the escaped bull had been pastured in an open range area or a herd district (the condition of the fence was not at issue as it was conceded that the bull was capable of jumping over the fence and thereby obtaining access to the highway).

¶ 16. Although it is difficult in Vermont to consider pasturing of horses as presenting an unavoidably unreasonable risk, at least one court has applied § 379A to find potential liability for a landowner in a negligence action involving a horse-motorist collision where the landowner knew the fence was in poor condition. See Gonzales v. Bierman, 773 P.2d 629, 630-31 (Colo. App. 1989). Other courts, however, have found application of the section questionable. See Byers v. Evans, 436 N.W.2d 654, 656-57 (Iowa App. 1988) (holding similar facts did not trigger landowner duty under § 379A, assuming it applied, where there was no "joint control" over animals, fences, or pens); Clauson, 477 N.W.2d at 260 (holding no landowner duty under § 379A, assuming it applied, where landowner exercised no control over fence design, but was merely aware fence existed).

¶ 17. Vermont is an agricultural state. Allowing a tenant to pasture a horse on the property does not, without some assumption of responsibility for control of the animal, create liability for permitting an "unreasonable risk." See Martin v. Christman, 2014 VT 55, ¶ 13, 196 Vt. 536, 99 A.2d 1008 (contrasting ownership of "dangerous animals" with ownership of "common farm animals"); Zukatis v. Perry, 165 Vt. 298, 302, 682 A.2d 964, 967 (1996) (implying that it is not unreasonable for horses to be kept near adjoining property where children live); see also Clauson, 477 N.W.2d at 260 n.5 ("Leasing land for the purpose of grazing horses is simply not the type of activity for which a landlord will be held liable under Restatement § 379A, since grazing horses would be dangerous to others only if done negligently."). We are not persuaded, therefore, to find a duty pursuant to the Restatement in this case.

¶ 18. Finally, underlying all of plaintiff's arguments is his allegation that landowner should have foreseen the possibility of harm that occurred. It is undisputed that landowner had no actual knowledge of horses previously escaping from the leased property or of the fence being in disrepair, prior to the night of the accident. Of course it is possible that Toomey nevertheless could have foreseen some possibility of horses escaping onto the adjacent road and posing a

8

danger to motorists, but "[f]oreseeability of injury, in and of itself, does not give rise to a duty." Hamill, 2005 VT 133, ¶ 6 (emphasis in original). As the trial court noted, requiring a landowner to regularly walk a tenant's property and check the condition of the fence would distort the contractual relations between landlord and tenant beyond reasonable bounds. The undisputed facts show that Toomey expressly disavowed any responsibility for care of the horses or maintenance of the fence. It was Wielt, not Toomey, who undertook to keep and care for these horses. See Murphy, 2014 VT 25, ¶ 42 (noting "basic tort rule that duty is measured by undertaking" (quotation omitted)). Because Toomey had no connection to the ownership, management, or control of the injurious horse or of the fence containing it, we cannot impose a duty on him to prevent that horse from escaping and harming passing motorists. We therefore affirm the trial court's grant of summary judgment to Toomey.

Affirmed.

FOR THE COURT:

_____
Associate Justice


¶ 19.   **ROBINSON, J., dissenting.**   Although a landlord generally has no duty to third parties injured by a tenant's animals that escape through inadequate fencing erected and maintained solely by the tenant, a landowner in possession of property does have a duty to third parties to act with reasonable care in exercising the control the landowner has over the property. Applying these principles to the facts in this case, plaintiff's evidence is more than sufficient to survive summary judgment, especially in light of the evidence that Toomey never leased the property on which the horses were pastured to Wielt, and that the property in question remained within Toomey's possession and control. The majority's analysis fails to recognize this

9

evidence, and misconstrues the impact of a prior decision of this Court and various statutes on the underlying common law framework. For all of these reasons, I respectfully dissent.

## I. Common Law Framework

¶ 20.    A landowner who fails to exercise reasonable care with respect to the conduct of others on the land or the condition of the premises may be liable to third parties for injuries resulting from the conduct or condition where the landowner knows or should have known of the conduct, and has the ability to exercise control over that conduct or condition. Several related common law rules reinforce this overarching principle, which explains most court decisions involving a landowner's duty in cases involving harm to third parties as a result of animals escaping from premises.

¶ 21.    First and foremost, a landowner (or one who possesses property) that permits another to use the land is, if present, under a duty to exercise reasonable care to prevent that person from creating an unreasonable risk of bodily harm to another if the landowner: "(a) knows or has reason to know that [the landowner] has the ability to control the third person, and (b) knows or should know of the necessity and opportunity for exercising such control." Restatement (Second) of Torts § 318 (1965). As noted in the Restatement:

> The mere fact that the possessor of . . . land permits a third person to . . . conduct an activity upon the land is not regarded as sufficient to make the possessor liable for the manner in which the third person . . . carries on the activity. It is, however, enough to require the possessor to exercise with reasonable care the ability which the possession gives [the possessor] to control the third person's use or activity when [the possessor] knows or should know that its exercise is necessary to prevent harm to others.

Id., cmt. a. This rule applies where the possessor of land is present when the activity is being carried on with the possessor's permission, and when, therefore, the possessor "has not only the ability to control the conduct of the third person as possessor, but also the opportunity to do so." Id., cmt. b. The possessor's duty to exercise reasonable care to control the conduct of third

10

persons for the protection of others applies not only when the possessor knows of the need to do so, but also when a reasonable person should know. Id., cmt. c. If the activity permitted on the land is dangerous only under particular conditions and in particular situations, the actor is required to exercise vigilance if there is a reasonable probability that such a condition or situation will arise. Id. In this setting, where the landowner knows of the unreasonable risk and has the ability to exercise control, the landowner does have a duty of care to third parties outside the premises who are injured as a result of activities on the premises.

¶ 22.   Second, in the context of leased premises, generally the landlord is not liable to others outside of the land for physical harm caused by any dangerous condition on the land that arises after the tenant takes possession, except where a landowner has agreed to make repairs. Id. § 377 (1965). This general rule reflects the reality that, unless a landowner has contracted to repair conditions on the premises, the landowner generally yields control over the condition of the premises, and over activities conducted on the premises, upon transferring possession. See, e.g., W. Prosser, Law of Torts § 63 (4th ed. 1978) (explaining that landlord is not generally liable to people injured on land or those outside of it for conditions that develop or are created by tenant, or activities carried on by tenant, after possession has been transferred because landlord surrenders both possession and control of land to lessee, retaining only reversionary interest).

¶ 23.   However, a landlord is subject to liability for physical harm to people outside the land caused by activities of the tenant or others on the land after the landlord transfers possession if, but only if: "(a) the [landowner] at the time of the lease consented to such activity or knew that it would be carried on, and (b) the [landowner] knew or had reason to know that it would unavoidably involve such an unreasonable risk, or that special precautions necessary to safety would not be taken." Restatement (Second) of Torts § 379A; see also Restatement (Second) of Prop., Land. & Ten. § 18.4 (1977) (setting forth same rule as reflected in Restatement (Second) of Torts). In other words, if a landowner leases property to another knowing that the tenant is

11

going to carry on an activity that involves an unreasonable risk, and the landowner consents to that conduct, then the landlord has a duty to third parties to exercise reasonable care. The landowner cannot avoid this duty by disclaiming responsibility for the tenant's planned activities in the lease; such a clause has no effect on the landowner's duty to third persons outside of the land who are not a party to the agreement. Restatement (Second) of Torts § 379A, cmt. d. This section of the Restatement recognizes that at the time the landowner transfers possession of property to another, knowing that the tenant's activities will pose an unreasonable risk to third parties outside the property, the landowner is liable for any damages resulting from the landowner's failure to exercise reasonable care to avoid the unreasonable risk.[2]

¶ 24.    Significantly, the relevant knowledge on the part of the landowner may involve not only the nature of the activity the tenant intends to carry on, but the way in which the tenant will carry it out. Take, for example, the illustrations in the Restatement: if a landowner leases property for use as a baseball park knowing that there is an unreasonable risk that in the ordinary course of a baseball game balls will be hit into the public highway in a way that is dangerous to those using it, the landowner may be liable to a driver on the public highway for injuries resulting from an errant ball. See Id., cmt. c, illus. 1. However, if, at the time the landowner conveys possession of the property, the baseball diamond is laid out so that there is no risk that a ball will be hit into the highway, and the tenant subsequently reorients the baseball diamond, thereby creating an unreasonable risk of errant balls striking passing motorists, the landowner will not be liable. Id., cmt. c, illus. 2. The underlying activity—baseball—is the same in both situations.    What distinguishes the landowner's liability in the two illustrations is (1) the way in

---

[2]    Likewise, a landowner who transfers possession to a tenant in a condition which the landowner realizes, or should realize, will involve unreasonable risk of physical harm to others outside of the land is subject to the same liability for that physical harm as if the landowner had remained in possession. Restatement (Second) of Torts § 379. At the time the landowner transfers possession, the landowner has both actual and constructive knowledge of the unreasonable risk, along with the legal ability to take steps to mitigate it.

which the baseball is played—i.e., the orientation of the diamond; and (2) landowner's knowledge at the time of the conveyance. In the first illustration, at the time of the conveyance the landowner knows or has reason to believe that the baseball will be played in a way that creates an unreasonable risk of physical harm to others outside the property. In contrast, in the second illustration the landowner has no reason to know of an unreasonable risk at the time the landowner relinquishes possession, and the associated control, of the property. In both cases, the activity to be conducted on the property is the same: baseball—an activity that in and of itself is not particularly dangerous to third parties. The critical question is not whether, at the time of conveyance, the landowner knows or has reason to know that the sport of baseball creates an unreasonable risk. Rather, the question is whether the landowner knows or has reason to know that baseball will be played on the property in a way that poses an unreasonable risk to third parties outside of the property.

¶ 25.    Understood together, these various rules of blackletter law reinforce the principle that the existence of a duty on the part of a landowner to exercise reasonable care to avoid harm to third parties outside the land resulting from activities conducted upon the land depends on the landowner's knowledge of the activities and ability to exercise control with respect to those activities. This understanding helps explain the otherwise apparently disparate case law involving injuries caused by escaped animals.

¶ 26.    In a case on all fours with the present case, the Washington Supreme Court upheld a jury verdict against a corporation for injuries to a motorist caused by a horse in the middle of a highway where the corporation had allowed an employee to keep a horse on the company's property. Misterek v. Wash. Mineral Prods., Inc., 531 P.2d 805, 806 (Wash. 1975) (en banc). After concluding that various statutes did not displace the common law, and eschewing the need to explore common law rules specifically relating to animals, the court concluded that the case could be resolved "upon the general principles of negligence." Id. at

13

807. The court relied on the general principle that one must maintain property so as not to injure those using the adjacent highway. Id. at 807. Although the company had conditioned the employee's use of the property to pasture his horse upon the employee repairing and maintaining the fence, there was substantial evidence that the company knew that the fences needed attention, that the horses were on its land, and that the land adjoined a public highway. Id. On these bases, the court affirmed the jury's verdict against the company. Id.

¶ 27. Wandering livestock cases involving landowners and tenants, while not directly applicable here for reasons set forth more fully below, also support the general principle that a landowner's duty depends on the landowner's knowledge and control of the premises or activities giving rise to an unreasonable danger. In Larson-Murphy v. Steiner, the Montana Supreme Court considered whether a landowner could be held liable for damages resulting from a tenant's escaped bull, which was struck by a motorist traveling on the adjacent highway. 2000 MT 334, 15 P.3d 1205, superseded by statute as stated in Knapton ex rel. E.K.v. Monk, 2015 MT 11, ¶ 13 n.2, 347 P.3d 1257. The court acknowledged the general rule that a landowner is not responsible to people injured on or off the land for conditions that develop or are created by the tenant after possession has been transferred. Larson-Murphy v. Steiner, 2000 MT 334, ¶ 103. However, citing Restatement (Second) of Torts § 379A, it also noted that a landowner is liable for physical harm to people off the land caused by activities of the tenant or others on the land if, at the time of the lease: (1) the landowner consents to the activity or has reason to know that it will be carried on; and (2) the landowner knows or has reason to know that the activity would unavoidably involve an unreasonable risk or that special precautions necessary to safety would not be taken. Id. ¶ 104. The court noted the related common law doctrine that a lessor is subject to liability for a nuisance caused by an activity carried upon the land while the lease continues if the lessor would be liable for carrying on the activity, at the time of the lease the lessor consents to the activity or knows it will be carried on, and the lessor knows or should know that the

14

activity will necessarily involve or is already causing a nuisance. Id. Because the landowner in Larson-Murphy knew that the tenants would be keeping livestock, including bulls, and was aware of the potential risks involved as evidenced by the landowner keeping livestock himself and requiring the tenant to carry liability insurance in anticipation of any damages the livestock may cause, the court reversed the trial court's award of summary judgment to the landowner. 2000 MT 334, ¶ 108. Significantly, the court rejected the argument that because the lease agreement required the tenants to maintain the fences and take whatever precautions were necessary for keeping the animals, the landowner was not liable to a third party. Id. ¶ 107. The court explained, "While such contractual obligations may give [landowner] a right to indemnification from [tenants], we conclude that an injured third party . . . is not party to such an agreement, and thus [landowner] cannot avoid liability if a legal duty was owed." Id. ¶ 108.

¶ 28. Similarly, in Gonzales v. Bierman, the Colorado Court of Appeals reversed an award of summary judgment to a landowner in a claim by plaintiffs who were injured when their car struck a horse owned by the landowner's tenant. 773 P.2d 629, 630 (Colo. App. 1989). In reaching its conclusion, the court cited § 379A and pointed to evidence that when the landowners transferred possession of the land to the tenant, they knew that the tenant kept horses on the land and knew or had reason to know that the fences on the land were in poor condition. Id.

¶ 29. In contrast, the Iowa Court of Appeals in Byers v. Evans considered a claim against a landowner by an individual who was injured when his car hit a swine that had escaped from pens on the adjacent land. 436 N.W.2d 654, 655 (Iowa Ct. App. 1988). The tenant had constructed the pens and fences at issue after taking possession of the property pursuant to the lease. Id. at 656. The court explained that when the landowner transferred possession of the property, the landowner surrendered possession and control along with the associated responsibility to people injured on or off the land. Id. Because the plaintiffs had not alleged facts showing that at the time the landowner transferred possession the landowner knew or had

15

reason to know that tenants' activities would unavoidably involve such an unreasonable risk, or that special precautions necessary to safety would not be taken, the court affirmed the trial court's dismissal of the action. Id. at 657; see also Edwards v. Chadwick, 321 A.2d 792, 799-800 (Md. Ct. Spec. App. 1974) (where landowner conveyed land to tenant with sound fencing in which horses could be contained, trial court properly instructed jury that landowner could be liable only if landowner knew or had reason to know, when transferring property pursuant to lease, that intended use of farm by tenant would unavoidably involve unreasonable risk of harm to users of highway); Flint v. Snow, 439 P.2d 610, 611 (Or. 1968) (landowner could be liable to injured driver if jury found that he retained some control over pasture from which horse escaped by breaking through fence).

¶ 30. Likewise, courts' rulings in cases in which a tenant's dog has bitten a third party outside the leased property have generally turned on an analysis of what the landowner knew, and what degree of control the landowner could exercise. For example, in Park v. Hoffard the Oregon Supreme Court in a unanimous decision considered whether a landowner was liable for injuries to a child on a neighboring property caused by the tenant's dog. 847 P.2d 852, 852-53 (Or. 1993) (en banc). Reviewing the Restatement (Second) of Torts § 379A, as well as its own related caselaw, the court concluded that a landowner can be liable for such injuries if two conditions are satisfied:

> (1) the landlord, at the time of entering into a lease, at the time of renewing a lease or a periodic tenancy, or at any time during a tenancy at will or other tenancy that the landlord is able to terminate unilaterally, consents to such activity or knows that it will be carried on, and (2) the landlord knows or has reason to know that the activity will unavoidably involve an unreasonable risk of harm to persons off the rental property.

Id. at 855. The Oregon Supreme Court concluded that a jury could find that the landlord consented to or knew that tenant had a dog that would unavoidably involve an unreasonable risk of harm to people off the rental property based on evidence that: (1) the tenancy was a month-to-

16

month tenancy; (2) the landlord was aware of the sign posted on the rental property that warned of a dangerous dog; and (3) the landlord was aware that the tenant's dog had previously bitten another child.[3] Id. at 856. The court accordingly affirmed the intermediate court's reversal of the trial court's award of summary judgment. Id.

¶ 31. Similarly, in Strunk v. Zoltanski, the New York Court of Appeals recognized that in such cases "to establish liability it must be shown that the [landowner] had knowledge of the vicious propensities of the dog and had control of the premises or other capability to remove or confine the animal." 468 N.E.2d 13, 15 (N.Y. 1984) (citation omitted). In affirming the trial court's denial of summary judgement against the landowner, the court cited evidence that the landlord knew that the tenant planned to keep a vicious dog on the property at the time landlord rented the property to tenant and failed to exercise reasonable care in connection with that risk. Id. at 15-16.[4]

_____

[3] In contrast to livestock, whose escape from enclosures and presence on public highways can pose serious danger to the traveling public without regard to a particular animal's vicious propensities, the escape of a dog from private property is not generally, in and of itself, considered dangerous. See, e.g., Trujillo v. Carrasco, 318 S.W.3d 455, 460 (Tex. App. 2010) (noting not reasonably foreseeable that escaped Labrador dog would destroy fence and kill neighbor's roosters based solely on dog's escape). The dog-bite cases require consideration of an additional element—the landowner's knowledge of the dog's dangerous propensities. Despite this distinction, these cases reinforce that the landowner's (1) knowledge; and (2) ability to exercise control (generally by declining to renew or continue the lease) are the critical factors in the analysis pursuant to Restatement (Second) § 379A.

[4] See also Uccello v. Laudenslayer, 118 Cal. Rptr. 741, 748 (Cal. Ct. App. 1975) (holding that because landowner knew of vicious propensities of tenant's dog and could have abated danger by terminating tenancy upon two weeks' notice, minor child bitten by dog had cognizable claim); Vigil v. Payne, 725 P.2d 1155, 1157 (Colo. App. 1986) (reversing trial court's dismissal of claim against landowners by minor plaintiff who had been attacked by tenants' dogs on leased premises because allegations that landowners had knowledge of vicious actions of tenants' dogs before entering into lease was sufficient to establish duty of care); Stokes .v Lyddy, 815 A.2d 263, 280-81 (Conn. App. Ct. 2003) (affirming summary judgment for landowners where uncontroverted evidence was landowners did not know about tenants' intention to keep dog, tenants never sought permission to do so, and there was no evidence that at inception of lease landowner knew of tenants' dangerous activity or had reason to know that it would involve unreasonable risk); Solesky v. Tracey, 17 A.3d 718, 739-40 (Md. Ct. Spec. App. 2011) (reversing award of summary judgment to landowner in suit on behalf of child injured off

¶ 32.    In all of the above cases, the critical question was: What knowledge of the risk did the landowner have at the time the landowner had the ability to take action to avoid or mitigate the risk?

## II.  Application to the Evidence in this Case

¶ 33.    Construing the evidence in the record in the light most favorable to plaintiff's claim, Rubin v. Town of Poultney, 168 Vt. 624, 625, 721 A.2d 504, 506 (1998), he has more than sufficient evidence to avoid summary judgment and get to a jury.  I focus in particular on two clusters of evidence: (1) evidence that Toomey never transferred possession of the property that was inadequately fenced to the possession and control of Wielt, and thus, throughout the period leading up to plaintiff's injuries, retained the degree of control of the property that is a prerequisite to liability; and (2) evidence that, while retaining the ability to control activities on the property, Toomey was fully aware of the state of the fencing.

¶ 34.    With respect to the first cluster, the jury could conclude that the horse escaped from a temporary enclosure on 1952 Harwood Hill.  In fact, in his motion below, Toomey asserts that the fact that the horse hit by plaintiff was pastured on the 1952 Harwood Hill lot on the day of the accident is undisputed.

¶ 35.    There is ample evidence that Toomey never leased the undeveloped 1952 Harwood Hill property to Wielt: Toomey's lease with Wielt only references the property at 1900 Harwood Hill, makes no mention of pasturing horses, and did not include the 1952 Harwood Hill property.  Wielt testified that the property she rented included the main house at 1900 Harwood Hill and included limited access to an associated temporary structure that was not on the 1952 Harwood Hill property.  Again, Toomey has identified this as an undisputed fact.  The evidence

property by tenants' dog where evidence supported inferences that landowner was aware of vicious tendencies of tenants' dog and could have exerted control over dangerous condition by, prior to signing lease, requiring tenants to take measures to ensure that dog would be adequately confined or by refusing to re-let premises if they were unwilling to abate danger).

suggests that Toomey did not lease the 1952 Harwood Hill property to Wielt for the purpose of pasturing her horses, but, rather, allowed her to pasture her horses on the 1952 Harwood Hill property by permission. As Toomey's statement of undisputed facts reflects, "Toomey allowed Wielt to pasture her horses in a south pasture on 1900 Harwood Hill Road and a north pasture on 1952 Harwood Hill Road."

¶ 36. Accordingly, an abundance of evidence supports the conclusion that Toomey retained possession and control of the 1952 Harwood Hill property through the date of the accident. The jury could conclude that, at most, Toomey extended to Wielt an open-ended, non-exclusive, permissive license to pasture her horses on his 1952 Harwood Hill property. In fact, that is probably the only conclusion the jury could reach on this record. Wielt's continuing pasturing of horses on the 1952 Harwood Hill property depended on Toomey's continuing consent to that arrangement. For that reason, this is not a landowner-tenant case, and the central consideration that infuses the applicable rule in those cases—that a landowner yields control over a property upon delivering it to a tenant pursuant to a lease—does not apply here. Instead, this case is most like the Washington Supreme Court's decision in Misterek, in which an employer allowed an employee to pasture horses on company property on the condition that the employee maintain adequate fencing. 531 P.2d at 806. Toomey gave Wielt permission to pasture her horses on the 1952 Harwood Hill property, retained his possession and ability to control that property throughout the period leading up to the accident, and at any time could have revoked his permission or required Wielt to erect a more secure enclosure.

¶ 37. The fact that Toomey required Wielt to ensure adequate fencing for the horses as a condition of her use may give rise to an obligation to indemnify him, but does not alter his obligations, as a landowner in possession and control of the property, to third parties. See Restatement (Second) Torts § 379A, cmt. d (providing that in landowner-tenant context, landowner cannot avoid duty of care to third parties by disclaiming responsibility for dangerous

19

activities in the lease); <u>Larson-Murphy v. Steiner</u>, 2000 MT 334, ¶ 108 (stating that in landowner-tenant context, tenant's contractual obligations relating to fencing livestock may give landowner right of indemnification, but cannot absolve landowner of liability to injured third party who was not party to agreement).[5]

¶ 38. The second critical factor in the assessment of Toomey's duty is the extent to which he was present and had knowledge of the activities conducted, with his permission, on his 1952 Harwood Hill property. Based on the evidence relating to the fencing, the jury could find that the enclosure boundary was within fifteen feet of a public highway; that the enclosure consisted of temporary electric fencing; that it consisted of fiberglass posts driven a few inches into the ground, with two strands of wire strung between them; that only a single strand of wire enclosed the gate to the enclosure; that there was significant slack in the fence wires and some fiberglass posts leaned over and, on some occasions, fell over; that the electric fence wires would sometimes touch grass or other foliage, thereby reducing its ability to contain the horses; and that the fence was three to four feet high.[6]

¶ 39. The record includes evidence that Toomey lived on the property adjacent to the 1952 Harwood Hill property, and that his gravel driveway to Route 7A passed right by the 1952

---

[5] I emphasize the fact that Toomey retained possession of the 1952 Harwood Hill property because that is apparently the property from which the horse escaped its enclosure. I do not mean to suggest that if the horse had escaped from the enclosure at 1900 Harwood Hill I would affirm summary judgment for defendant. The lease in this case appear to be a month-to-month lease, meaning Toomey had the ability to assert control over use of that property each time he renewed the lease. The analysis with respect to this parcel would be different, but the outcome would not. See <u>Park v. Hoffard</u>, 847 P.2d at 855 (noting landowner may be liable because of "special relationship" arising from landowner's "ability to control the activities of the tenant" through deciding whether to renew lease).

[6] The focus of this appeal is the question of whether Toomey had a duty to plaintiff. Whether, assuming that he had a duty to third parties to take reasonable care with respect to the way horses were pastured on his land, these facts are sufficient to show a lack of reasonable care will be a question for the jury. This is sufficient evidence of an unreasonable risk to get to the jury on the question whether Toomey breached his duty of reasonable care, but may not compel the conclusion that he did.

Harwood Hill property enclosure. Wielt testified that Toomey would have seen the horse pasturing "any time he was in the vicinity." In fact, Toomey testified that he walked past the horse pastures on his way to the grocery store "almost daily," often stopping to feed the horses apples as he passed. The fence at 1952 Harwood Hill was installed within ten to fifteen feet from the southbound lane on Route 7A—the major road by which Toomey accessed his home. On the basis of this evidence, a jury could have concluded that Toomey had knowledge of the way in which the pastured horses were contained on the 1952 Harwood Hill property, and the condition of the fencing.

¶ 40. Given that the jury could conclude that Wielt's activities on the 1952 Harwood Hill property depended upon Toomey's continuing consent, because Toomey maintained possession and control of that property, and given Toomey's knowledge of Wielt's activities there—including the condition of the fencing—I cannot agree with the majority that Toomey is entitled to summary judgment on the question of duty. Basic principles of tort law compel the opposite conclusion.

### III. The Majority's Analysis

¶ 41. The majority opinion misses the mark both on the facts and the law. With respect to the facts, the majority's failure to recognize the significance of Toomey's continuing possession and control over the 1952 Harwood Hill property undermines much of its analysis. With respect to the law, the majority's conclusion that, notwithstanding these common law principles of landowner liability, only the owner of an animal can be liable in tort for injuries resulting when the animal is negligently allowed to wander at large, is not supported by the case or statutes relied-upon.

¶ 42. On the factual question, if this were a case in which Toomey, as landowner, had transferred possession of the property to Wielt, as tenant, pursuant to a lease for a specified term, and subject to an agreement that Wielt would construct and maintain adequate fencing for her

21

horses on the leased premises, the majority's analysis might make more sense. The majority clearly frames the case this way. See, ante, ¶ 8 ("Our question on appeal is: What duty, if any, runs from Toomey, as noncustodial landowner, to plaintiff?"). But the undisputed evidence does not support this narrative. As a consequence, much of the majority's analysis misses the mark.

¶ 43. For example, the majority focuses on the question whether the activity of pasturing horses creates an unreasonable risk. If Toomey had transferred possession of the property in question to Wielt knowing only that she would be pasturing horses there, the key questions would be whether at the time Toomey transferred possession of the property to Wielt, he both consented to her pasturing the horses there and knew or had reason to know that (1) pasturing horses as a general proposition unavoidably involves an unreasonable risk, or (2) that Wielt would not take the necessary precautions. But Toomey never did transfer possession of this property to Wielt. He retained control of the property through the night of the accident. Given this fact, the right question in determining whether he had a duty of reasonable care to third parties off the property is whether he knew how Wielt was fencing the horses.

¶ 44. Likewise, the majority's assertion that Toomey has "no connection to the management or control of the injurious horse or of the fence containing it," ante, ¶ 18, simply isn't true where he not only owns but possesses and controls the property on which the pastured horses were purportedly enclosed by the fence. And the statement that "[r]equiring landowner to walk the tenant's property and check the condition of the fence would distort the contractual relations between landlord and tenant beyond reasonable bounds," ante, ¶ 18, implies a landlord-tenant relationship that doesn't exist. Toomey has maintained possession of this property, and in so doing, has retained the obligation to take reasonable care with respect to activities he allows on his property. See Restatement (Second) of Torts § 318, cmt. a (requiring possessor of land to exercise with reasonable care ability which possession gives possessor to control third person's

22

use or activity when possessor knows or should know that its exercise is necessary to prevent harm to others).

¶ 45.   Finally, to the extent that the cases relied upon by the majority are conceivably relevant to this case at all, they fit a factual scenario that does not match the evidence in this case.  The case that comes closest to this one, insofar as it involves the duty of a landowner in connection with livestock pastured on the landowner's property, fits the paradigm relied-upon by the majority, but is inconsistent with the evidence.  In Blake v. Dunn Farms, Inc., the landowner had not, in leasing the property, contemplated a use that required fencing, lived far away from the property, and had no knowledge of the bad condition of the fences, while the errant horse was owned by a sub-lessee.  413 N.E.2d 560, 565-66 (Ind. 1980).  In that case, the landlord had neither the control nor the knowledge necessary to establish a duty.

¶ 46.   The case of Clauson v. Kempffer is a step further from the wandering-animal cases, and instead involves a straightforward dangerous-condition-on-the-land, but likewise fits the mold of a true landowner-tenant case.  477 N.W.2d 257, 257-58 (S.D. 1991).  In that case, a landowner leased property to a tenant for a six-month term.  There was a private road across the property that had formerly been a forest service road used by the public to gain access to public land.  After the landowner conveyed possession of the land, the tenant constructed a fence on the property that included a single smooth strand of wire strung across the road.  A motorcyclist driving on the private road lost control of his motorcycle upon encountering this hard-to-see obstacle, and suffered injuries.  The court concluded that even though the landowner had knowledge of the dangerous condition, he did not have the necessary control.  477 N.W.2d at 259-60.  In particular, the court held that because the lessee created the danger after the lessor conveyed the property—when the lessor no longer retained any control over the premises, had no right of re-entry, and had no reserved right to control what activities were performed on the land or how they were conducted—the lessor could not be held liable for the motorcyclist's injuries.

23

Id. The case has nothing to do with the obligation of landowners with respect to wandering animals, as suggested in the majority opinion. To the extent that it deals more generally with landowner liability for dangerous conditions created by a tenant, the court's analysis is entirely consistent with the analysis above.[7]

¶ 47. With respect to the majority's legal reasoning, it offers a purported rule of law that is not supported by the case or statutes cited in support. In particular, the majority concludes that only a horse's "owner or keeper" may be liable in a civil action for damages suffered as a result of a horse's escape. Ante, ¶ 10. Neither our prior decision in Wright v. Shedd, 122 Vt.

---

[7] The other two cases relied upon by the majority are completely inapposite. In Jacobs v. Stover, 243 N.W.2d 642 (Iowa 1976), two adjoining landowners, the Stovers and the Stallmans, could not agree on the maintenance of the boundary fence between their properties. Pursuant to state law, fence viewers ordered the Stovers to maintain the north half of a boundary fence and Stallman the south half, and required them to do so by a specified date. Before that deadline, while the repairs were underway, one of the Stovers' horses wandered from the Stovers' property onto the Stallmans's across a point on the fence line that the Stallmans had been ordered to maintain. From the Stallmans' property, the animal went on to the public road, where the accident occurred. The issue before the court in the decision cited by the majority is whether the Stallmans, who neither owned the horse nor the land on which the horse was housed, but who had a statutory obligation to maintain a boundary fence between their own property and their neighbors' property by a date that had not yet arrived, could be liable for the injuries. The case has nothing to do with the issues before us in this appeal.

Likewise, in Sutton v. Duke, 176 S.E.2d 161 (N.C. 1970) the only analysis that is conceivably relevant to this case undermines the majority's assertion that only a person that owns an animal is liable for injuries caused by its escape. The complaint in that case alleged that a landowner and a railroad company that delivered fertilizer inside a fenced area on the landowner's property through a rail spur that passed through a gate on the landowner's property negligently left open the gate. Due to this negligence, a pony that was enclosed inside the gate escaped. The pony then ran about five hundred yards, across a road, to an enclosure where another person kept four mules. The pony agitated the mules to the point that the mules broke out of their enclosure. A driver encountered the mule on the road about three quarters of a mile from its enclosure. Because he encountered the mule just as another car was passing, he was unable to avoid the mule. The driver suffered serious injuries in the collision. The question before the court on the defendants' motion to dismiss had nothing to do with the obligation of a landowner with respect to inadequate fencing of animals on the owner's property. Instead, the court assumed that both the landowner and the rail company could be liable for negligently leaving the gate open. The question before the court was whether the plaintiff could establish proximate cause given the attenuated causal connection between the negligence that allowed the pony to escape its enclosure and the damage to the plaintiff on account of the mule's escape. 176 S.E.2d at 168-69. The court expressed skepticism, but concluded that the complaint could survive a motion to dismiss. The decision offers no insights relevant to the issue in this case.

24

475, 177 A.2d 240 (1962), nor the statutes governing the fencing of animals cited by the majority, support the conclusion that Vermont has excepted the keeping of animals from the general common law obligations of landowners outlined above.

¶ 48. The Wright case simply doesn't address the issue. In that case, this Court reversed the trial court's directed verdict for both husband and wife in connection with a claim by a driver who was injured upon colliding with a horse on the road. There was evidence that the husband owned the horse and that the enclosure for the horse was inadequate. The court did not cite any evidence whatsoever concerning the wife. In upholding the directed verdict for wife, this Court said "there is nothing in the evidence to connect her with the ownership, management or control of the horses that were involved in the accident." 122 Vt. at 477, 177 A.2d at 242. From this passing statement, the majority infers that this Court held that only the owner of a horse, or a party charged with controlling the horse, could be held liable for injuries to third parties. Ante, ¶ 9. I don't see how that conclusion follows. The majority seems to assume that the "ownership, management or control" of a horse referenced in the Wright opinion does not encompass ownership and control over the land on which the horse is housed. That suggestion, directly at odds with the well-established common law principles set forth above, requires a substantial leap. There is nothing in the Wright decision to suggest the wife owned the property on which the horses were pastured, or that any party even argued wife had a duty of reasonable care on the basis of her ownership and control of the property on which the horse was ineffectively pastured.

¶ 49. Likewise, there are two critical problems with the majority's claim that various statutes relating to wandering livestock reflect a legislative intent to limit civil liability for personal injury damages caused by an escaped horse to the horse's owner. Ante, ¶ 10. First, the majority assumes that because the Legislature has imposed statutory obligations accompanied by civil fines on owners or keepers of certain animals that wander upon the lands or premises of

25

another, it intended to preempt the common law with respect to any other class of individuals who may have duties of care in connection with the enclosure of those animals. That assumption runs counter to the principle that "[t]he common law is changed by statute only if the statute overturns the common law in clear and unambiguous language, or if the statute is clearly inconsistent with the common law, or the statute attempts to cover the entire subject matter." Langle v. Kurkul, 146 Vt. 513, 516, 510 A.2d 1301, 1303 (1986); see also E.B. & A.C. Whiting Co. v. City of Burlington, 106 Vt. 446, 464, 175 A. 35, 44 (1934) ("[R]ules of the common law are not to be changed by doubtful implication, nor overturned except by clear and unambiguous language."). The bare fact that the Legislature has imposed civil fines on livestock owners for allowing their animals to wander, and has held them responsible for damage resulting therefrom, does not support the majority's assertion that the Legislature intends that only a horse's owner should be held liable in a civil action for personal injury damages suffered as a result of a horse's escape.[8]

¶ 50.     Consider, for example, the case of Sutton v. Duke, 176 S.E.2d 161, relied upon by the majority. In that case, a railroad agent negligently left open a gate at a property to which the railroad made a delivery through a rail spur. The escape of a pony from its enclosure as a result of this negligence ultimately led to an injury to a motorist. If, as the majority suggests, the only party that can be held liable for damages caused by livestock that escapes its enclosure is the person who owns the livestock, the railroad would be immune from suit. Or consider a

---

[8] The majority asserts that the Legislature intended for liability to extend to a horse's "owner or keeper," ante, ¶ 10, but the statute it relies upon in connection with this case, 20 V.S.A. § 3345, only references the obligations of an "owner." A different statute, whose scope is limited to the wanderings of uncastrated adult male horses, applies to both owners and keepers, but has no application here. See 20 V.S.A. § 3349(a). The logical conclusion of the majority's premise that these statutes relating to the fencing of horses limit the scope of civil tort liability is that only a horse's owner may be liable in tort for injury caused when the horse escapes—unless the horse is an adult, uncastrated male, in which case the keeper may also be liable. That distinction makes no sense as a matter of tort law.

26

commercial stable that houses horses for multiple clients. Under the majority's view, the stable would have no enforceable duty of care to third parties injured as a result of the horses' escape. That doesn't make sense.

¶ 51. The second flaw in the majority's reliance on these statutes regulating farmers' pasturing of livestock in an agrarian society is that the statutes have nothing to do with liability in tort for personal injuries to passing motorists injured as a result of animals on the highway. The statutes appear in a subchapter regulating the control of animals. The subchapter has several provisions, including one relied upon by the majority, exclusively regulating roaming by adult, male, uncastrated livestock—provisions clearly designed to prevent those animals from impregnating or otherwise injuring fellow farmers' livestock.[9] With respect to cattle, horses, sheep, goats, or swine more generally, the subchapter establishes varying fines for allowing livestock to run in a public highway or yard belonging to a public building without the consent of the selectboard, 20 V.S.A. § 3341 ($3.00—$10.00 fine); in public parks, commons or greens without the permission of the selectboard, id. § 3342 ($5.00—$25.00 fine); enclosed townhouses, churches or schoolhouses, id. § 3343 ($3.00—$10.00 fine); and enclosed burial grounds, id. § 3344 ($25.00 fine). The title of the remaining provision in this subchapter reflects that it relates to the only category of property not subsumed within the prior several sections: "Land or Premises of Another." 20 V.S.A. § 3345. That provision, which the majority contends

---

[9] See 20 V.S.A. § 3346 ("The owner or keeper of a bull more than nine months old may be fined . . . if such bull is more than nine months old and liable for damages if the bull is outside the premises of the owner or keeper); id. § 3347 (making ram's owner or keeper liable for damages resulting from ram's going at large between August 1 and December 1 in each year, and if during such time ram is found with sheep other than those of his owner and not in his enclosure, owner or keeper of such sheep may recover $5.00 of ram's owner or keeper); id. § 3348 (requiring that rams be marked and providing compensation for person taking and securing ram at large between August 1 and December 1); id. § 3349 (stating owner or keeper of stallion more than one year old may be fined and liable for damage done for negligently allowing stallion to run at large, and may be fined for keeping stallion in a private enclosure between April 1 and December 1 in a manner that disturbs adjoining landowner).

supports its view that the Legislature has limited tort liability for roaming horses to the horses' owners, provides:

> A person who knowingly permits his cattle, horses, sheep, goats, swine, or domestic fowls to go upon the lands or premises of another, after the latter has given the owner notice thereof, shall be fined not more than $10.00 nor less than $2.00. Such person shall also be liable for the damages suffered which may be recovered in a civil action.

Id. This provision, and the statutes within the subchapter on enclosing livestock, cannot be said to carry the weighty significance the majority assigns to it.

¶ 52.    First, the title of this section relied upon by the majority, "Land or Premises of Another," reflects that it does not even apply to livestock roaming on public highways.  "We have long held that the title of a chapter, subchapter, or section, as well as the statute's purpose, may be considered in interpreting a statute."  State v. Hurley, 2015 VT 46, ¶ 11, __ Vt. __ 117, A.3d 433.  The fact that the subchapter includes a different subsection specifically addressing the consequences of cattle, horse, or other specified livestock roaming onto a public highway without the consent of the selectboard further undermines the suggestion that § 3345 provides clues as to the Legislature's intent concerning injuries to drivers on public highways as a result of unenclosed livestock.  See In re Preseault, 130 Vt. 343, 346, 292 A.2d 832, 834 (1972) (holding that statutes pertaining to the same subject "are to be construed with reference to each other as parts of one system").  The section relied upon by the majority cannot carry the water the majority ascribes to it.

¶ 53.    Second, the provision in this subchapter that does address horses running at large in a public highway provides: "A person who knowingly permits cattle, horses, sheep, goats or swine to run at large in a public highway . . . without the consent of the selectboard, shall be fined not more than $10.00 nor less than $3.00."  20 V.S.A. § 3341.  The fine authorized by the provision is not limited to the owner of the wandering animal, but extends to any person who

28

permits the animal to run at large. The provision allows livestock to wander on public highways with the permission of the selectboard. It says nothing about civil liability for personal injuries caused by the wandering livestock, and the maximum fine is $10.00. Nothing about this statute supports the bald assertion that the Legislature intended that only a horse's owner or keeper should be liable in a civil action for damages suffered as a result of a horse's escape. Ante, ¶ 10.

¶ 54. Finally, the subchapter as a whole assigns varying consequences for allowing livestock to roam outside of enclosures. Some provisions assign consequences to owners, some to "owners and keeper," and some to any person. Some include only fines, while some contemplate liability for civil damages. The consequences of an unenclosed, wandering animal vary depending on the location of the wanderings and whether the animal is an uncastrated adult male. None of these distinctions translate into sensible tort law concepts. As a whole, this subchapter tells us nothing about the Legislature's intent concerning civil liability for personal injury damages suffered by drivers on public highways who encounter unenclosed livestock. See Larson-Murphy v. Steiner, 2000 MT 334, ¶ 28 (concluding that laws governing owners' obligations with respect to fencing livestock, "have little or nothing at all to do with the legal relationship between livestock owners and motorists under a theory of negligence"); see also Jacobs v. Stover, 243 N.W.2d at 644 (noting statutes dealing with rights and duties of adjoining landowners toward each other for trespassing farm animals have no application to tort claim by driver injured by farm animal in public road).

¶ 55. I spill so much ink on this analysis because of the troubling implications of the majority's suggestion that only the owner of a farm animal can be liable in tort to a driver injured on a public highway when the animal escapes. In so holding, the majority does far more than merely shield landlords from liability for inadequate fencing of livestock by their tenants. Wholly apart from the landowner-tenant context, the majority's apparent holding would shield property owners who do not own the animals on their property from any duty to maintain

29

adequate enclosures—or any enclosures at all[10]—when they permit the pasturing of animals on their land, even if they retain exclusive possession and control of that land. This position would leave Vermont's common law relating to such cases far outside of the national mainstream. And, it could severely limit the remedies available to individuals who suffer grievous injuries as a result of the negligence of landowners or other possessors of land who fail to take reasonable care in managing the pasturing of animals on their land. Such a dramatic departure from ordinary common law tort principles should not be inferred lightly—especially not through negative implication from a decision and statutes that do not actually address the question.

¶ 56.    For the above reasons, I respectfully dissent.

_____

Associate Justice

---

[10]    The undeniable consequence of the majority's conclusion that the landowner has no duty of reasonable care to third parties off the land with respect to the enclosure of horses pastured, with the landowner's permission, thereon is that even if Wielt had not erected any fence at all, but had relied on her horses' general tendency to stay close to home, and even if Toomey was fully aware of this, he would not be subject to potential liability.